# Exhibit  A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2
                          - - -
 3
    ALLERGAN, INC.,              :        Civil Action
 4  ALLERGAN SALES, LLC,         :
                                 :
 5           Plaintiffs,         :
                                 :
 6       v.                      :
                                 :
 7  ALCON, INC., ALCON           :
    LABORATORIES, INC., and      :
 8  ALCON RESEARCH, LTD.,        :
                                 :
 9           Defendants.         :        No. 04-968-GMS

10                        - - -
                   Wilmington, Delaware
11               Monday, November 22, 2004
                       2:00 p.m.
12                   In Chambers
                          - - -
13
    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
    APPEARANCES:
15
            TIMOTHY DEVLIN, ESQ.
16          Fish & Richardson P.C.
                 -and-
17          JONATHAN E. SINGER, ESQ., and
            MICHAEL J. KANE, ESQ.
18          Fish & Richardson, P.C., P.A.
            (Minneapolis, Minnesota)
19
                      Counsel for Plaintiffs
20
            JOHN W. SHAW, ESQ.
21          Young Conaway Stargatt & Taylor, LLP
                 -and-
22          DANIEL J. THOMASCH, ESQ., and
            M. VERONICA MULLALLY, ESQ.
23          Orrick, Herrington & Sutcliffe LLP
            (New York, New York)
24
                      Counsel for Defendant
25
```

2

1          THE COURT:  Hello, counsel.

2          MR. DEVLIN:  Good afternoon, Your Honor.  Tim

3    Devlin from Fish & Richardson.

4          (Counsel respond "Good afternoon.")

5          MR. DEVLIN:  I have with me Michael Kane and John

6    Singer, also from Fish & Richardson.

7          THE COURT:  Great.  Which office?

8          MR. SINGER:  I am actually from Minneapolis.

9          MR. SHAW:  Good afternoon, Your Honor.  John Shaw

10   for defendants.  And to our left, Daniel Thomasch from Orrick

11   and Veronica Mullally.

12         (Counsel respond "Good afternoon.")

13         THE COURT:  I am going to start off by telling

14   you, what we will leave with here are broad strokes, and I

15   will send you back to work on details.  I will impose on the

16   plaintiff to set things down in a scheduling order and

17   circulate for my signature next Monday.  That will be

18   helpful, if you would do that.

19         There is not a lot that the parties agree on.

20         I guess the first thing we should address is the

21   matter that was raised in your letters to me of October 4 and

22   September 30 regarding I think it's Alcon's view that the

23   Court should permit early filing of summary judgment and a

24   counter-position from plaintiff.

25         MR. THOMASCH:  This is the third lawsuit between

1  these very parties, the third ANDA lawsuit involving

2  brimonidine products that Alcon has sought to bring to the

3  Court in generic formulations and that Allergan has sought to

4  stop.  Both of the prior actions, one of which was briefly in

5  your Court, both of those were resolved on summary judgment

6  and without discovery.

7        This presents the third of those lawsuits.  These

8  are different patents that have been asserted and these are

9  now product patents instead of method patents.  There are

10 three patents that are at issue -- three patents that are

11 relevant to this case.  And I think I can within probably two

12 minutes tell you exactly where our summary judgment would

13 lie.  We have additional defenses that would go beyond this,

14 but right now we would like to be completely focused on two

15 issues that we believe warrant summary judgment.

16       The three relevant patents all come from one

17 common parent application.  So they all share the same

18 specification.  That parent application sought claims to a

19 brimonidine product, a chemical product, that would be used

20 to lower interocular pressure in the eyes of individuals

21 suffering from interocular hypertension or glaucoma.  That

22 use of brimonidine is well known.  It's been out for a long

23 time.  And you can't get a patent to that anymore.

24       What these applications sought was a patent to

25 allow that type of product with something that Allergan

4

1   called an SEC, a solubility enhancing component.  They said,

2   we can add this solubility enhancer to brimonidine.  It will

3   allow the brimonidine to be used at a higher pH, closer to

4   that of the eye, to where it is applied.  And we think that

5   would be beneficial.  That is what they sought in the parent

6   application.

7                Those broad claims were rejected.  They were

8   rejected because the use of these types of SECs with

9   brimonidine had been well-documented in the past and there

10  was a past, the Burke '911 patent, that covered exactly

11  that.

12               What was said by Allergan was, but, while many

13  SECs are disclosed, only one of those was what we call an

14  anionic SEC.  The others are nonanionic SECs.

15               Now, what they say we use is a nonanionic SEC.

16  What they use is an anionic SEC, called CMC.

17               So they say, yes, the art had many uses of

18  solubility enhancing components with brimonidine, but no one

19  would have thought to select the anionic SEC.  We have

20  figured that out.  We have figured out, that has surprising

21  benefits that were unexpected.  So we can patent that as a

22  separate invention.

23               So those broad claims were narrowed down in the

24  patent that was directly prosecuted off of the parent

25  application and they received claims to cover the use -- to

1    cover brimonidine with an anionic SEC.

2              Now, they haven't sued us on that patent, because

3    it is conceded that we don't have an anionic SEC in our

4    product.  So if that is their invention, there is no lawsuit.

5              From that same parent application, however, they

6    received two additional patents, one by way of a divisional

7    and one by way of a continuation.  The divisional patent

8    ultimately came down to -- it was made a divisional because

9    originally the Patent Office said, you have too many

10   inventions in this original patent, and some of them involve

11   a preservative, an oxychloro preservative, and we want you to

12   make that a divisional, a separate patent application.  They

13   did.  So they then prosecuted the use of brimonidine with an

14   oxychloro preservative.  And the Patent Office said, the

15   claim is rejected.  That's been done in the art before,

16   that's not new and novel.

17             In response to that, what Allergan did was

18   dropped the oxychloro preservative.  The only reason they had

19   the divisional was because of that preservative, but they

20   just dropped it.  And they simultaneously and very unusually

21   added in the requirement that there be an SEC.  They did not

22   do what you are required to do in the Patent Office, which is

23   underline the language that you are adding to the claim.

24   They didn't do that.  But they added new text to the claim

25   that added an SEC, and the claims ultimately issued.

1      That leaves us with our first issue, the

2  construction of the phrase a solubility enhancing component

3  other than a cyclodextrin.  That phrase is in that patent.

4  We say that, properly construed, that phrase must mean an

5  anionic SEC, because otherwise it is effectively the exact

6  same claim as the broad claim from the parent that was

7  rejected and required them to define their SEC as an anionic

8  SEC.

9      We say the divisional has to have the exact same

10  claim construction if those five or six words are construed

11  the way we say they should be construed, which is based

12  strictly on the intrinsic evidence, if that construction is

13  given, and the patent claim requires an anionic SEC, then

14  again, we are just like the unasserted '210 patent.  They

15  have no claim against us and the case is over on that front.

16      If the Court were to decide that any SEC met the

17  limitations of that patent, there would be potentially

18  triable issues down the road as to whether we have any sort

19  of SEC in ours.  What they claim is an SEC in our product, at

20  least they admit not an anionic SEC.

21      So we have one claim construction issue on the

22  divisional.  If the divisional means the same as the parent

23  application, we believe then the case will be over as to that

24  divisional as to the '337 patent.

25      The other patent came off the same

1   specification.  They immediately canceled all the claims by

2   way of preliminary amendment, put in new claims.  The new

3   claims have an upper limit on the amount of the active

4   ingredient in the product.  This product was previously sold

5   at .2 percent, and when they canceled the claims they put a

6   limit in and they claimed the use of the product with up to

7   .15 percent.  There is not a word in the specification that

8   mentions .15 percent.  There is not a word in the

9   specification that mentions an upper limit.

10          So we have a straightforward lack of written

11  description, invalidity based on absence of written

12  description, requires no discovery whatsoever.  The only

13  issue is looking at the specification, does that

14  specification support the revised claims which added the new

15  matter of up to .15 percent.

16          So in the case of the continuation patent, it is

17  a written description summary judgment argument.  No

18  discovery required.  We simply want to look at the claim and

19  spec and say there is no support for these claims because

20  nothing in the claim relates to the amount.  Indeed,

21  everything in the specification is .2 percent or higher,

22  every chart, every example.  It would only teach one to use

23  that much.  There is nothing there that would even suggest

24  that you go to a lower amount.

25          In the first patent, where we have the issue of

1   how does the Court define the term solubility enhancing

2   component, is it defined the same way as it was defined with

3   regard to the main patent, there, again, it's simply a matter

4   of a limited amount of prosecution history and the

5   specification and the claims.  Again, if it is defined as an

6   anionic SEC, there is no factual dispute.  And so, in our

7   mind, there is no discovery whatsoever.

8           Now, if we were to potentially lose either aspect

9   of that, there could be facts in dispute in the case.

10          So we would not -- we are not seeking to in any

11  way delay this case.  We have every reason to want to make

12  this case go quickly.  We believe we have an absolute right

13  to be on the market.  But by law, as soon as they file a

14  lawsuit, the FDA is now prohibited from approving our product

15  until such time as we resolve this lawsuit or until we get

16  out in 36 months.  So the mere making of an allegation in

17  this context as opposed to the normal situation has a very,

18  very difficult effect on us.

19          And this has happened twice to us in the past,

20  and both times we received summary judgments that allowed us

21  to go late to the market but nevertheless to get to the

22  market earlier than we would have if we hadn't been allowed

23  to make a summary judgment motion.

24          That is what we seek here.  What we would like to

25  do, with the Court's permission, is initiate the process by

1  writing Your Honor a letter.  We can easily do it within the

2  space parameters that you allocate, and we can lay out our

3  entire motion for summary judgment, why it would be

4  appropriate for you to hear it.  That is, frankly, our entire

5  approach to this case, because as of February 28th we should

6  be allowed to be on the market but we will not be allowed to

7  be on the market, the FDA will not approve our product if

8  this case just exists.

9         THE COURT:  So you really seek to combine the

10  summary judgment and Markman process because there is --

11         MR. THOMASCH:  The Markman process only with

12  regard to one phrase in one patent, the solubility enhancing

13  component.  We do cite to a 2004 case where the Federal

14  Circuit affirmed summary judgment that did just that in the

15  University of Rochester case.  This is really, it is an

16  extremely straightforward claim construction issue, and

17  really questions whether or not there is a reason to

18  interpret the claim differently from the patent that came

19  down to become the '210 patent, which they didn't assert

20  against us, and the divisional application of that same

21  patent.

22         THE COURT:  You have alluded to the possibility

23  of remaining factual issues.

24         MR. THOMASCH:  The main factual issue on that

25  patent that we are now discussing.  They claim we have an

1    SEC, a solubility enhancing component.

2              THE COURT:  Do will we still have a case left to

3    try?

4              MR. THOMASCH:  There would be a case left to try

5    on that.  We say we don't have such a component.  We say what

6    we have is a viscosity enhancer and that is a different

7    animal altogether.  But the parties are in agreement,

8    whatever it is, it is not anionic.  If the requirement is it

9    has to be anionic, then the game is over.  If you were to say

10   any type of SEC would meet the limitation, we would have to

11   have a trial to decide whether we even have any type of SEC.

12             THE COURT:  Assuming I rule in your favor.

13             MR. THOMASCH:  It's over.

14             THE COURT:  Case-dispositive.

15             MR. THOMASCH:  Case-dispositive.  Completely

16   dispositive, with one-term claim construction on one patent.

17   No claim construction necessary on the other patent.  They

18   have added a limitation when they amended the claims.  They

19   added a maximum amount of active ingredient claim.  And there

20   is not a word in the specification that supports that limit.

21             THE COURT:  Okay.

22             MR. SINGER:  Quite naturally, I disagree, Your

23   Honor.  First off, let me sort of ground this.

24             Counsel, and in their letters and report, keeps

25   raising the prior lawsuits.  Indeed, this is the third

11

1  lawsuit between the parties, one of which was initially

2  before you, before being transferred out to Judge Carter in

3  California.

4           This case really does not have anything to do

5  with those prior lawsuits.  What those lawsuits were about,

6  if the Court has not taken the time to read the decision, was

7  a statutory interpretation of the Hatch-Waxman Act.  There

8  are actually landmark cases cited by patent practitioners

9  across the country citing which types of patents can be

10  asserted under Hatch-Waxman and which cannot.

11           At the time Allergan filed the previous lawsuits,

12  that was an undecided issue.  In fact, two district courts

13  decided the way Allergan viewed the statute, that we were

14  permitted to bring these claims.  But ultimately, the Federal

15  Circuit decided Allergan was not permitted to bring those

16  claims.

17           So the summary judgment that is being referred to

18  by the other side was an issue of statutory interpretation.

19  The merits of Allergan's infringement claim under those

20  patents were actually never addressed.  Indeed, if you go

21  into Judge Carter's earlier decision, what Judge Carter said

22  was, had Allergan been permitted to bring this claim under

23  the Hatch-Waxman issue, there were genuine issues of fact for

24  trial.

25           So our infringement claim was well-grounded.

1    Ultimately, the Hatch-Waxman was interpreted not to permit it

2    under the statutory provisions.  So let's talk about this

3    case, because this is what matters.  That's the past.

4              What is going on in this case, in our view, is

5    sort of an effort to try it by surprise.  A lot of what I

6    heard today is sort of the first time what I have heard about

7    their defense.  We have been asking about their defenses, and

8    to their credit, we did receive the required certification

9    before the lawsuit was filed detailing some of what I heard

10   today.

11             At the Rule 26 conference, I asked what the

12   defenses would be, what would be the subject of the summary

13   judgment motion, and I was not told.  Again, in the letter to

14   you of September 30, it also did not list that.  But

15   responding to the merits of what counsel has said, let's talk

16   about the upper limit concentration.

17             Indeed, what is going on here, we have two

18   patents, each covering a different invention.  As you will

19   see in the Rule 26(f) report, we explain the differing

20   inventions.  The old formulation of brimonidine was at about

21   .2 percent.  And there are various side effects with

22   brimonidine, including drowsiness and other things, where one

23   always desires to get that active ingredient down.  It's

24   always good to have less of these medications, if you can

25   maintain the same effectiveness of the drug.

1          What Allergan's scientists discovered is that you
2     are surprisingly able to formulate at a much higher pH than
3     people would have thought possible given the chemical nature
4     of brimonidine.  Brimonidine, the old product, was formulated
5     at about 6.6 pH, which is slightly acidic pH, a slightly
6     acidic formulation.

7          I am trying to get my chemistry straight.  Below
8     7 is acidic and above 7 is basic.

9          The new product is actually a basic formulation.
10    So this is a switch and a very surprising switch, that you
11    can formulate at these higher pH's, thereby reducing the
12    concentration of brimonidine, getting less medicine to
13    patients and less side effects.

14          This is the about the benefit of this invention.

15          With respect to the invalidity summary judgment
16    motion, I don't understand it.  To say that there is no
17    mention of about .15 in the application elevates form over
18    substance to the extreme.  In the patent application, there
19    is a disclosure of a formulation of .1451.  The claim
20    limitation at issue is about .15.  If .1451 is not about .15,
21    I don't know what is.  So if a summary judgment motion is
22    going to be made, all that is going to result from that is us
23    responding that there is support in the written description
24    for about .15.

25          Under the Federal Circuit authorities cited by

1    them, and cited by us, the issue of whether or not there is

2    disclosure to support about .15 is strictly a matter of

3    fact.  And what you will have is a dispute, and I suspect a

4    dispute between experts.  If they are going to tell me they

5    are not going to make this motion without expert testimony,

6    that is fine.  We intend to put on experts to show there is

7    support for this limitation.  So we will have a dispute

8    between experts as to whether or not it exists.

9           Frankly, we think -- as I said, we don't

10   understand how .15 isn't about .1451.  They are awfully

11   close.  Under the Federal Circuit authorities, there is

12   clearly support for that limitation.

13          With respect to an early summary judgment, we

14   think it would be a distraction.  We are entitled to

15   discovery, both in terms of their contentions, which we have

16   not fully gotten, what they intend to use to support them, as

17   well as any facts they intend to rely on, and indeed whether

18   or not their scientists, for example, in Alcon would agree as

19   persons of skill whether .1451 is about .15.  These are the

20   kinds of things that we think discovery is meant to explore

21   and we think we are entitled to.

22          And we are not proposing a very long schedule

23   here.  This is not something which we are saying requires

24   years and years to do.  We have put forward a close of all

25   discovery I believe August of next year and fact discovery

1    closing sooner than that.  It is not something we are saying

2    requires years and years to do, but rather can be done in

3    eight months' time.

4              Second, with respect to the other patent, the SEC

5    patent.  There is, apparently, a Markman dispute over the

6    meaning of the term solubility enhancing component.  I would

7    submit that under Federal Circuit law it would be error for

8    this Court to construe the term solubility enhancing

9    component to mean anionic solubility enhancing component.

10   There are a variety of reasons, not limited to which there is

11   a dependent claim in the patent.  The broad claim says

12   solubility enhancing component.  A dependent claim says

13   wherein said solubility enhancing component is anionic.  They

14   are violating the doctrine of claim differentiation, among

15   other doctrines that would be violated, to construe those

16   terms to mean the exact same thing.

17             With respect to the file history mentioned by

18   counsel, it was not that these claims were somehow passed on

19   forever.  The Court is very familiar with the patent practice

20   at the U.S. PTO.

21             The examiner did indeed reject claims at the

22   outset.  Those claims were then withdrawn without prejudice

23   by the applicant.  And he specifically said that they

24   intended to resubmit them at a later date for examination.

25   And they were, in fact, resubmitted for examination at a

1    later date, and the examiner allowed them.

2              So to the extent we are going to have a summary

3    judgment motion here, we think we ought to go through the

4    process of having these contentions laid out, such that this

5    isn't trial by surprise, which we think would be unfair and

6    an inappropriate use of the parties' time.

7              THE COURT:  It's the exception in patent cases

8    counsel come in at this stage of the process and ask for

9    early summary judgment and/or Markman.  I am on the Bench now

10   more than six years.  I think it's happened twice.  Each of

11   us carries roughly 50 patent cases on this Court.

12             MR. THOMASCH:  I am very much aware of the load,

13   Your Honor, and the desire not to add to it.

14             THE COURT:  I wasn't going there yet.  I was

15   going to get there.

16             MR. THOMASCH:  It is the unusual nature.  This is

17   an ANDA lawsuit, which gives rights to the plaintiff merely

18   by the filing of a complaint without any showing.

19             THE COURT:  That explains the defendants'

20   interest in an earlier trial date.  I understand the market

21   economics that are driving this.  This is obviously not this

22   Court's first experience with an ANDA lawsuit.

23             Unfortunately, both organizations, both

24   businesses, are unable to resolve your differences amicably,

25   at least thus far, and you are in a litigation environment.

1    That necessarily subjects you to a process that I make every

2    effort on this Court, in this chambers, to accommodate with

3    the economics of matters, with an eye on those things,

4    because we are obliged, as judges, to oversee the just and

5    speedy determination of disputes.

6        But where I have, as we have here, a

7    disagreement, apparently vigorous disagreement, I am not in a

8    position, obviously, to determine the merits of the parties'

9    positions on this particular issue.  Essentially, I would

10   need to, in order to do that, interrupt other matters in

11   order to insert this into a position where we could provide

12   for a letter-briefing or whatever briefing regime and have me

13   gear up with the technology and entertain argument, to the

14   exclusion of other matters that are, quite frankly, ahead of

15   you, and some, quite frankly, involving ANDAs, one that is

16   burning on my desk at present.

17       So while I am sensitive to defendants' concerns

18   and expressed needs, I don't think I am convinced, given the

19   opposition from the plaintiff, that it would be the

20   appropriate thing to do for me today to say, yeah, we are

21   going to do an early summary judgment process in this case.

22   If both parties agreed that it would benefit the process, I

23   might be otherwise inclined.

24       MR. THOMASCH:  That could never happen in an ANDA

25   context because their only goal is delay.

1          THE COURT:  Well, let me interrupt.  You are an

2    advocate, I am sure a fine one.  I am sure we have equally

3    fine advocates on the other side.

4          That is a bit of hyperbole, it's got to be, with

5    respect -- I am sure delay is in their interest.

6          MR. THOMASCH:  For the first 30 months, delay and

7    victory are one and the same.  After 30 months they do have

8    an interest in victory.  For now, those two are

9    contemporaries.

10          We don't ask Your Honor today to give us the

11    right to make a summary judgment motion.  Our request is much

12    more limited.  We would like permission from Your Honor to

13    initiate the process by writing a letter to Your Honor to set

14    forth in some greater detail than can be absorbed or than I

15    can articulate here as to why it would be appropriate, why it

16    is straightforward, why this will have to be dealt with

17    eventually.

18          And the one thing that seems clear to us is,

19    whether or not they claim that there are defenses -- of

20    course they are going to claim there are defenses -- they

21    don't require discovery.  This can be done based on a review

22    of the record, a review of the spec, a review of the claims.

23          THE COURT:  Counsel, you are going to make that

24    argument in greater detail in a written submission and in

25    further subsequent oral discussion much more comprehensively

1   than you have been able to make it today.  But this Court is

2   going to be met with an equally urgent and comprehensive

3   argument in contra.

4           Quite frankly, just looking down the road a

5   little bit, if you were to put yourself in my position, the

6   plaintiff cries foul.  Says prejudice.  Let the discovery

7   process play itself out.  We have a right to have that

8   happen.

9           MR. THOMASCH:  We are okay with that.  We do not

10  wish to stop them from taking discovery during the process of

11  briefing and argument of the summary judgment motion.  We may

12  have discovery on many, many issues that will of course add

13  to the expense of the parties and potentially the time of the

14  Court to the extent there are discovery disputes about other

15  issues.  But we are prepared to do that while simultaneously

16  saying, there are two very specific issues, one per patent,

17  that we want to bring on summary judgment.  It is of course

18  my burden to show that factual disputes aren't involved.  All

19  they have to do is raise a factual dispute and they win.

20  They don't have to try the whole case.

21          But I would not bring this motion if I didn't

22  think it was going to succeed.  While the last two cases were

23  both about statutory interpretation, in those situations, Mr.

24  Singer vigorously pushed for discovery.  The Court said,

25  let's deal with these threshold issues first, and they were

1    ultimately decided our way.

2              Discovery won't be necessary if our legal

3    arguments, two legal arguments, are correct.  And they are

4    very straightforward arguments.  We could have short limits

5    on the briefing, as far as time and pages.

6              THE COURT:  You contend your arguments are based

7    on the file wrapper.

8              MR. THOMASCH:  The file wrapper, the spec and the

9    claims, that's it.

10             THE COURT:  You say.

11             MR. SINGER:  One of his legal arguments isn't a

12   legal argument at all.  It is a fact argument, whether or not

13   a claim has support, sufficient written description for the

14   claim.  The about .15 issue, that is not a legal argument at

15   all.  That is a factual argument.  They claim it doesn't.  We

16   claim it does.  We think we are right.  They think they are

17   right.  That's a factual dispute.

18             MR. THOMASCH:  The Federal Circuit has many times

19   agreed that you can have summary judgment on this issue.  It

20   says up to about .15 percent.  It is an upper limit.  There

21   is law on, if you are going to put a limit in your claims,

22   there is certain support you need, the only place for that

23   support is in the spec.  Your Honor can look at the spec and

24   make this decision.  This case wouldn't go to a jury anyway.

25   Your Honor will ultimately deal with these issues.

1        It is an ANDA issue lawsuit.  There is no money

2   at issue.  It is a right to get on the marketplace.  It will

3   before you as a finder of fact, but you may decide at this

4   stage of the case, as a matter of law, this can only go one

5   way because there is not support in the spec for the up to,

6   the limitation of up to .15 percent.

7        If it's a disputed fact, you deny the summary

8   judgment motion.  But the Federal Circuit says you can do

9   this.  The Rochester case says absolutely.

10        THE COURT:  I understand.  But your opponent

11   suggests that the Court is going to need to hear from experts

12   on this particular point.  You say no.

13        MR. THOMASCH:  Absolutely not.  Whether it is

14   there or not the Court can gather by reading the

15   specification.

16        THE COURT:  Why can't I read the specification

17   and simply resolve the issue?

18        MR. SINGER:  The issue on a written description

19   claim is what in the specification discloses to one of

20   ordinary skill whether the inventor was in possession of the

21   claimed invention.  Mr. Thomasch says that there is not a

22   word there.  And the limitation is about .15.  That's what we

23   are talking about, is a limitation of about .15 in some of

24   the dependent claims.  Again, I pointed here today to

25   something that is .1451 that I think notifies someone of

1    ordinary skill that there is about .15 in the specification.

2    And we would put forward an expert to say that, under the

3    view of the person of ordinary skill in the art, that

4    specification discloses the limitation about .15.  And that

5    is at the end of the day an issue of fact.

6              The Rochester case, which they keep alluding

7    to -- I actually teach a course in my spare time about

8    biotech patent matters.  The Rochester case figures heavily

9    in that course.  That case is akin to our first case, where

10   there was an issue of statutory interpretation.

11             In the Rochester case, what happened, Your Honor,

12   it wasn't about an upper limit of anything in the case.  What

13   happened in that case was -- this is a famous drug, the Cox

14   II inhibitors, Vioxx, which has been in the news.  This case

15   was about a university that had discovered a method of

16   screening drugs to identify those that might inhibit Cox II

17   but not inhibit Cox I, and therefore provide these benefits,

18   which you have read about in the news.

19             They didn't discover at all the existence of such

20   a drug.  What they discovered was a way to screen for such

21   drugs.  Nonetheless, they claimed any drug that inhibited Cox

22   II.  And what the Federal Circuit said in that case was that

23   you can't claim the Cox II inhibitor drug from a patent that

24   is about screening.  It is not about upper limits at all.

25             What this case is about, this is a classic

1  written description dispute about whether or not a limitation

2  is supported by the factual disclosure of the specification

3  and whether or not the various formulations in the patent --

4  and there are a bunch of them, there are a bunch of examples,

5  there is an extensive table with I think 20 or so

6  formulations, there is a graph which shows further

7  formulations -- whether those, as a matter of fact, are

8  enough to support about .15.  I think as a matter of fact, we

9  think it is, but they contend that it isn't, which is a

10  matter for trial.

11          One other point, with respect to -- actually, two

12  other points.  With respect to this delay point, about 30

13  months, that is absolutely true, that the filing of a lawsuit

14  stays any FDA approval for 30 months.  We are proposing a

15  trial date that is well in advance of the 30-month stay,

16  almost a year in advance.  The FDA is on record that the

17  average ANDA takes over 20 months to approve.  Now, I don't

18  know what Mr. Thomasch is referring to in respect to February

19  28th.  Maybe they have some communication from the FDA that

20  they expect to approve on February.  That may happen.  It may

21  not happen.

22          But at the end of the day, what Allergan seeks

23  here is a vindication of its patent rights, not delay of

24  Alcon's generic competition.

25          Finally, with respect to issue of trial, I think

1  Mr. Kane can speak to this, but the issue of whether or not

2  this goes to a jury is a matter of dispute between the

3  parties.  This is a disputed issue.  We welcome the

4  opportunity to brief the Court on it.  It is not settled by

5  the Federal Circuit.

6         There are a variety of approaches that courts

7  have taken.  I think some courts have taken ANDA cases and

8  put them to the jury, I think the District of New Jersey.

9  Others have not.  I think the Northern District of Illinois

10 is one notable Court where they have not gone to the jury.  I

11 think the District of Massachusetts has taken a third way and

12 said the Federal Circuit has not spoken as to whether or not

13 these things go to the jury, we are going to do an advisory

14 jury so we don't have to redo this later on.

15         So this is not as black and white in terms of the

16 jury issue as Mr. Thomasch says.  And we would welcome -- I

17 think the parties both believe it is an issue that requires

18 further exploration for the Court.  The Court has to decide

19 one way or the other.  But it is not a simple issue that it

20 doesn't go to the jury.

21         MR. THOMASCH:  Your Honor, we both misspoke.  If

22 I could just correct two statements.  I misspoke when I

23 mentioned the University of Rochester with respect to the

24 '834 patent with the upper limit.  With regard to the upper

25 limit I meant to cite the Purdu Pharma versus Falding case.

1    The University of Rochester case was a case where claim

2    construction was used in the context of a summary judgment

3    motion such as we seek in the other case.

4           I believe that Mr. Singer misspoke when he has

5    said repeatedly that the term is about .15 percent.  The

6    claim language is up to about, and the up to is the maximum

7    limit, which is essential to our argument that we are dealing

8    with an upper limit.  And the simple disclosure of any number

9    in the patent that would be below that we would suggest does

10   not give you an upper limit.

11          They will put in an expert affidavit saying this,

12   if you believe that this is a matter in which it is a battle

13   of the experts, our motion should be denied.  Our point will

14   not be that our expert is more persuasive or that we

15   necessarily even have an expert.  Our point will be that on

16   the specification, and under guiding Federal Circuit

17   precedent, we cannot find an upper limit in a claim where

18   there is no upper limit in a specification.  It's that

19   straightforward.  The Court may accept or reject our

20   argument.  But it won't get into a battle of the experts.  If

21   you find that you need assistance from an expert on this, you

22   will deny our motion I am sure.

23          THE COURT:  There is a contention that you

24   misspoke inadvertently.

25          MR. SINGER:  I don't believe I did.  There are a

1  variety of claims in the patent.  I believe Mr. Thomasch was

2  saying up to .15.  There is a limitation up to about .15.  I

3  believe there is also a limitation -- let me pull it out --

4  of up to .15.  There is also a limitation of .15.  And I

5  believe there is a limitation of about .15.  Those are four

6  different claims that we have in the patent.

7           THE COURT:  I am going to deny your request.  I

8  understand.

9           MR. THOMASCH:  Thank you for considering it,

10 Judge.

11          THE COURT:  It is an interesting argument.  We

12 will, as counsel has suggested, need to at some point address

13 or perhaps build into this process the ability to address the

14 jury versus nonjury issue, since there is not agreement on

15 that.

16          Regardless, the Court will not be available for

17 trial on the schedule that is suggested by the defendants.

18          As it happens, purely coincidentally, the Court

19 does have March 6 available, as has been proposed by the

20 plaintiff as a date for the commencement of either a jury or

21 nonjury trial.

22          We are going to schedule this, in terms of the

23 allotment of time, as if it were a jury trial, and if that

24 should change based on subsequent submissions, we will have

25 the luxury of reducing the number of days allotted to try the

1  case.

2         Given that, the Court's availability, it strikes

3  me that the schedule proposed by the plaintiff as to both

4  fact and expert discovery makes some sense.  I will hear from

5  the defendants if you disagree with that.

6         MR. THOMASCH:  No, Your Honor.  If Your Honor has

7  indicated that it is going to accept plaintiffs' date for

8  trial, then we would not thereafter argue that it's

9  nonsensical to put the discovery cutoff dates where they

10  are.  We would, however, ask the Court to consider both an

11  early Markman and an early right of summary judgment after

12  some discovery is taken so that all issues involving this

13  case don't need to proceed, even if you limit us to one

14  summary judgment only, I am prepared to accept that

15  limitation, if Your Honor would just allow us to make that

16  summary judgment motion earlier in the case rather than

17  later, because time is what this case is all about.

18         THE COURT:  How do you feel about that?

19         MR. SINGER:  Your Honor, if we could explore

20  through discovery what their defenses are through the

21  contention process, I think we proposed a Markman hearing

22  that was somewhat earlier in the process.

23         THE COURT:  It's in the eye of the beholder.

24  Let's see if counsel agrees.  I am available for Markman on

25  June the 7th at 9:30.  That's close to what you propose.  One

28

1    day.

2              What is your view of early Markman?

3              MR. THOMASCH:  Ours was April 1.  If we are going

4    to trial, there may be multiple claims that need to be

5    construed in both patents.  There is this separate issue of

6    one claim in one patent, one claim term.

7              THE COURT:  There is only a two-month difference

8    in the Markman schedules that you propose.

9              MR. THOMASCH:  The real issue is not Markman,

10   Your Honor.  The real issue is the date on which we may make

11   a summary judgment motion, which the plaintiffs have

12   attempted to hold off until November 1, 2005.  We would like,

13   of course, to make that summary judgment motion in 2004.

14   There is about 11 months separating us on that.  That is the

15   key issue.  If we were permitted to make the summary judgment

16   motion, for instance, in March of 2005, we could make that

17   motion, imbedded in that motion --

18             THE COURT:  Let me interrupt for a second.

19   November summary judgment process doesn't work for the

20   Court.  In your discussions, what you are going to need to

21   keep in mind is, I try to preserve about four months from the

22   completion of briefing for any summary judgment motion that

23   is permitted.  And you will need to build into that process

24   an exchange of letters, consistent with what I suspect you

25   know is my practice that will enable that letter-writing

1    exchange to be completed at least seven days in advance of

2    the teleconference.

3              MR. SINGER:  Fair enough.  We will abide by that,

4    Your Honor.

5              THE COURT:  Then you set up, you can get other

6    scheduling orders, they are out there, that will guide you in

7    terms of setting a cutoff for case-dispositive, the filing of

8    case-dispositive motions and the language that I employ.

9              MR. THOMASCH:  The question I would ask is when

10   is the earliest date on which we may initiate that process?

11             THE COURT:  I am going to leave that to your

12   discussion, your attempted agreement.  I do want to get back

13   to your proposal, because I don't know that I got a response

14   exactly, where defendants would seek to have summary judgment

15   on the one issue, or is it two?

16             MR. THOMASCH:  Two issues but one motion on those

17   two issues.  One per patent.

18             THE COURT:  And limit itself in the leadup to

19   trial to just those two issues, whether you are willing to

20   engage -- which would, I assume counsel is arguing, should

21   permit an earlier process, sooner rather than later summary

22   judgment engagement.

23             MR. SINGER:  If we were permitted the chance to

24   do discovery and seek contention discovery, proper contention

25   discovery and also deposition discovery where relevant, I

1    don't see that that is a problem in the sense of them filing

2    a motion sometime after that process has been sort of

3    undertaken.

4            THE COURT:  That is fine.  It may be the case,

5    you may not be willing to do this, I don't know, I don't know

6    if it is possible to do this, you may want to stage your

7    discovery, your fact and expert discovery -- not expert, fact

8    discovery we are talking about, in terms of getting those

9    issues, that discovery resolved and done, should the Court be

10   willing to engage an early process on these two issues, a

11   limited process on these two issues, if that is possible,

12   then the Court would entertain the submission, a proposed

13   schedule that would accommodate that.  But I will not hear

14   any other summary judgment beyond that, if we are talking

15   early.

16           MR. THOMASCH:  If we are able to do early, we

17   would be willing to limit ourselves.

18           THE COURT:  I don't know what the plaintiffs'

19   view of summary judgment is and whether it intends to seek

20   summary judgment.

21           MR. SINGER:  I don't know what their other

22   defenses are, Your Honor.  I can't respond to that.  With

23   respect to some of the issues, certainly, we are open to the

24   plaintiff seeking summary judgment on certain issues, to

25   obviously confine the trial in an appropriate way.  But until

1  we get discovery as to what defenses they intend to rely on,

2  we have heard today of two, but we received a letter from

3  them in July that had about ten defenses.  And for us to sort

4  of pick and choose, we need to know which ones they intend to

5  put forward.  If all of them, so be it.

6          MR. THOMASCH:  We do have multiple defenses if

7  the case were to proceed to trial.  We have two that we view

8  as case-dispositive without requiring discovery.

9          THE COURT:  Here is what we will do, given the

10  sincere assertions here today that these contentions would be

11  truly case-dispositive, and given your apparent

12  willingness -- you haven't voiced an objection yet -- to

13  perhaps staging discovery in a manner that would enable the

14  parties to tee that matter up for summary judgment

15  consideration sooner rather than later -- is that a fair

16  assessment?  Are you willing to do that?

17          MR. SINGER:  We are willing to do that so long as

18  we receive sufficient discovery.  The view on discovery I

19  think is very different.  We are hearing from counsel that no

20  discovery is required.  We think substantial discovery is

21  required.  So it's sort of a -- Your Honor, absolutely, I

22  don't want to stand in the way of these kind of defenses, but

23  we have a fundamental disagreement about whether discovery is

24  necessary.

25          THE COURT:  You are entitled to that.  I am not

1  attempting to strong-arm you in that regard.  I qualify, if

2  it is possible, after a further meet-and-confer, for the

3  parties to agree on that, I am willing to grant permission to

4  file that motion today.  You will still have -- you won't --

5  but the plaintiff will still have the opportunity to engage

6  my typical summary judgment practice later on down the road

7  if you desire.  That is, seeking permission.  You will have

8  to build that into the schedule, seeking permission.  But the

9  defendants will have fired across your bow and that will be

10 it.

11             MR. THOMASCH:  We have for clarification provided

12 our entire file, the regulatory file seeking approval for

13 this product.  They have had that for months.

14             THE COURT:  I am not going to micromanage.

15             MR. THOMASCH:  Discovery has been ongoing in that

16 sense.  We produced voluminous materials already.

17             THE COURT:  I hear you.  I am not going to --

18 everybody around this table operates in the Court's view

19 under the presumption that you are professionals, you are

20 officers of the Court, and that you are not engaged in

21 dilatory tactics, engaging in dilatory tactics.  Therefore, I

22 don't expect that that is going to happen.  So to the extent

23 that plaintiff disagrees with you, that he has sufficient

24 discovery to be able to resist your motion, I am going to

25 expect that counsel are going to act like professionals in

33

1   that regard and do what you can do to provide that

2   information and the opportunity to get that information.

3           MR. THOMASCH:  We will absolutely do so,

4   recognizing if he has been deprived discovery that is under

5   the Federal Rules a basis for denying our motion which the

6   rules would otherwise allow us to make as soon as this issue

7   is joined.

8           THE COURT:  It certainly is.

9           MR. THOMASCH:  It is a basis to deny it.  We

10  can't gain through that.

11          THE COURT:  Again, I don't attribute any poor

12  motives to either counsel, or the parties themselves.  Not

13  yet.

14          I am speaking in broad strokes here.  Does that

15  make sense to counsel?

16          MR. KANE:  It does, Your Honor.  If I could chime

17  in.   The only issue I guess I have is, if in fact we are --

18  what I thought I heard the Court say, you were available for

19  a June 7 Markman hearing, at least one of their summary

20  judgment motions is going to be dependent upon a Markman

21  issue.  And the way they are characterizing the second it

22  almost sounds like it may be also a Markman issue.  I am --

23          THE COURT:  I thought there was only one term.

24          MR. THOMASCH:  There is only one Markman issue.

25  That is in the divisional that relates to whether the SEC is

1    any SEC or only an anionic SEC.

2         MR. KANE:  The reason I said it sounds like there

3    is two actually, Your Honor, Mr. Thomasch has been saying

4    because of the language in the claim that says up to about,

5    that's the basis of his written description argument, which

6    sounds to me like it could potentially implicate some Markman

7    rulings.  Be that as it may, whether one or two Markman

8    issues, if we are going to have a Markman hearing on June

9    7th, I am wondering if it make sense to tie the summary

10   judgment motions to that same hearing so the Court could deal

11   with the Markman issues at one time.

12        THE COURT:  You know, I will agree to that.  I

13   normally don't engage that process.  Chief Judge Robinson

14   does.  We have a little bit of a different approach.  But I

15   have been wanting to experiment with that anyway.  We will do

16   that.  Do you agree?

17        MR. THOMASCH:  We would like to do it in

18   advance.  As I understand what counsel is asking for is our

19   briefing for summary judgment and briefing for the Markman to

20   occur together, leading up to the Markman post-briefing on

21   June 7th.

22        THE COURT:  Well, I am not sure.

23        MR. THOMASCH:  That is the way Chief Judge

24   Robinson has done it in the past.

25        MR. KANE:  That is what I believe I was

1    anticipating.

2        MR. THOMASCH:  We would like to do it earlier.

3    But if Your Honor will permit us to do so, we will.  If Your

4    Honor will not permit us, we will take the first date Your

5    Honor will permit us to do it.

6        THE COURT:  What you are going to need to give my

7    chambers guidance on, my staff guidance on, is we are going

8    to need potentially two Markman dates, I guess.

9        MR. THOMASCH:  If we did it early on, because you

10   did at one point say they could hold off, we could take our

11   shot now.  Our shot now would require just the Markman on the

12   limited amount, and we do have Federal Court cites for cases

13   in which Markman has been imbedded in the rulings without a

14   separate Markman hearing.

15       THE COURT:  No.  There is plenty of precedent for

16   that.  That is not a concern.

17       MR. THOMASCH:  We would do it just for that.  We

18   would theoretically need another Markman if we were to lose

19   and there were other claims to be construed before trial.

20       THE COURT:  That is my point.  Do you agree or

21   disagree with that?

22       MR. SINGER:  I think that's correct, Your Honor.

23   I think we could do the summary judgment Markman on the two

24   motions on the June 7 hearing and we could do another Markman

25   to the extent there were -- again, I don't know what there

1  is, but we could do that later on in advance of trial. We

2  could even do it in the context of motions in limine.

3              MR. THOMASCH:  I understood June 7 to be the

4  Markman, and what we were thinking about was in advance of

5  that just dealing with the summary judgment motions that

6  would have the one term.  But ultimately, I don't think we

7  should be delaying from what the plaintiff proposed for the

8  Markman date.

9              THE COURT:  What is your view as to whether you

10  can get the discovery done for the early summary judgment

11  process?

12              MR. SINGER:  By June 7.  I think that is very

13  feasible.

14              THE COURT:  Before June 7, to enable the Court to

15  have an earlier than June 7 Markman.

16              MR. SINGER:  We have not gotten responses to

17  their -- we served our discovery requests quite promptly.

18              MS. MULLALLY:  Today.

19              MR. SINGER:  We actually served them on Friday,

20  which is right after the Rule 26(f) meeting was held.  We

21  held it I think about two weeks ago today, and we served our

22  discovery requests promptly.  We have not gotten initial

23  disclosures from the other side.

24              MR. THOMASCH:  They are not due.

25              MR. SINGER:  No one is criticizing.  We are

1    simply saying what has and hasn't been done.  From my

2    perspective, we think a fair opportunity for discovery here

3    on these two issues is going to take three or four months.

4            With respect to a June 7 Markman date, we are

5    talking about briefing in advance of that, that that fits

6    perfectly.  We do not and we think it was unfair in fact to

7    sort of propose they file a summary judgment -- I think the

8    notion was they wouldn't object to discovery ongoing during

9    the summary judgment process.  There are rules, and we have

10   to respond to briefing, and there is very short time limits.

11           THE COURT:  Fair enough.  We will use that as the

12   June 7th, as the date for this so-called earlier process.

13           MR. THOMASCH:  That actually rolls our real

14   Markman back even later than the plaintiff proposed.  We

15   proposed April.  They proposed June.  And now we are going to

16   be later than June.

17           THE COURT:  You could agree not to disagree.  It

18   could come to pass --

19           MR. THOMASCH:  Could we have an opportunity to

20   try within ourselves to see if one or two stages, to let Your

21   Honor decide with letters back, if we can't agree, then you

22   just make the call?

23           THE COURT:  I don't want letters back.  You can

24   contact chambers by phone if you can't agree, and we will set

25   a teleconference.

1          MR. THOMASCH:  That would be fine.

2          THE COURT:  I don't want letters back.  I have

3   enough to read.  See what you can do.  If you can agree on an

4   earlier date, then that is fine.  I am not going to express a

5   view.

6          MR. SHAW:  Could we put the June 7 date in our

7   calendar so we don't lose that?

8          THE COURT:  It is on the calendar, at 9:30.

9          We won't be able to set, assuming two summary

10  judgment, potential summary judgment -- we will need one

11  teleconference for summary judgment then, because I have

12  granted permission, assuming agreement on the discovery,

13  underlying discovery matters, process, we won't need a

14  teleconference for that.  So you will need to, when you have

15  agreed whether that is going to occur, you are going to have

16  to dial up chambers and get a date so you can insert that

17  into your schedule, that you have agreed upon.  Do you

18  follow?

19         MR. DEVLIN:  I understand, Your Honor.  We need a

20  teleconference in advance of the briefing for the full sweep

21  of summary judgment motions.

22         MR. SINGER:  Later on in the case.  Fair enough.

23  Thank you, Your Honor.

24         MR. DEVLIN:  We will call your chambers sometime

25  in the summer to get that.

1          THE COURT:  Ms. Tyer-Daly will give you a date

2     for that once you have put the other details --

3          MR. THOMASCH:  The next thing I understand we

4     will do when we leave is we will shortly confer with each

5     other to see if we can reach an agreement under which

6     discovery would begin, leading to an early summary judgment

7     motion by the defendants --

8          THE COURT:  On discrete issues.

9          MR. THOMASCH:  Which would be our one shot on

10    summary judgment in the case.  If we reach agreement on that,

11    we will let Your Honor know.  And you have agreed, I think,

12    that if we reach agreement on that, that will be all right by

13    you.

14          THE COURT:  Yes.

15          MR. THOMASCH:  If we don't reach agreement on

16    that, we will contact Your Honor for a conference to see

17    where that leaves us.

18          THE COURT:  Yes because I expect where there is a

19    potential disagreement is just in terms of time that you are

20    going to need.

21          MR. THOMASCH:  I think we now understand our

22    range of options.

23          THE COURT:  All right.  You have agreed on --

24    motions to amend on or before December 1.

25          MR. THOMASCH:  Your Honor, I wonder if it would

1    be permissible if I could leave.  Chief Judge Robinson has me

2    in front of her in final pretrial in 30 seconds.

3                    THE COURT:  You better go.

4                    MR. THOMASCH:  Thank you, Your Honor, counsel.

5                    (Mr. Thomasch leaves conference room.)

6                    THE COURT:  December 1, you are going to do

7    initial disclosures on or before November 24.

8                    MR. SINGER:  I don't mean to interrupt, Your

9    Honor.  I think, other than the one issue on the summary

10   judgment, I think that we are in agreement with the trial

11   date of March 6 as to what the calendar ought to be, as a

12   general matter, with the middle, that one issue remaining.

13   We had talked about it on the phone beforehand, and we

14   recognized our disagreement.  There was agreement as to

15   amount of time discovery would take to go forward.

16                   THE COURT:  Your pretrial order date is January

17   9, that is close of business, '06.  February 6, '06, 10:00

18   o'clock for our pretrial conference.

19                   There remains the question of jury versus non.

20   There is also an issue of advice of counsel and willfulness

21   as well.  We can take them in either order.

22                   MR. SINGER:  I would make a suggestion that we

23   could deal with the issue on advice of counsel as well as

24   jury through whatever process the Court would want, whether

25   letter briefs or whatnot, and leave that for the Court's

41

1   ultimate decision.  These are somewhat novel issues.  There

2   is some new case law on the point I think that is cited by

3   counsel for Alcon, on the willfulness point.  We disagree

4   with their narrowly circumscribing it to this case.  I could

5   lay out the disagreement if you want to hear it.  It is just

6   another disagreement between the parties.  I would suggest we

7   could handle it through letter briefing.  It would be very

8   straightforward.

9           THE COURT:  Will it impact discovery?

10          MR. SINGER:  The willfulness issue would impact.

11  We had proposed that near the end of discovery, typically, I

12  think, for willfulness, that the opinion of counsel discovery

13  go forward, so if a discovery cutoff was in August, I think

14  we are proposing willfulness discovery go forward beginning

15  in June of 2005.

16          MS. MULLALLY:  We should address it before we get

17  there.

18          THE COURT:  You should want to submit letter

19  briefs if you can't agree in advance of that time.

20          MR. SINGER:  Perhaps, if we are going to be

21  before the Court on June 7, it is another matter that could

22  be taken up at that time?

23          THE COURT:  We could possibly do that.  I guess

24  we won't need much time for actual claim construction on June

25  7.

1          MS. MULLALLY:  No.

2          THE COURT:  So we could certainly address that

3    then.  So I would like that briefing ten days in advance, ten

4    business days in advance of the June 7 hearing.

5          MS. MULLALLY:  Just on willfulness.

6          THE COURT:  Yes.  Just on that issue.  We are

7    talking about the jury issue.  Do you want to address jury

8    versus non as well at that time?

9          MR. SINGER:  We could.  I don't want to

10   overburden the Court.

11         THE COURT:  We could do that.  I was thinking we

12   could address it at the pretrial conference.  Perhaps you

13   would like to know before that time.  Yes, we should.  That

14   will materially affect the work that you have to do on the

15   pretrial order.  Yes, that makes sense.

16         MR. SHAW:  Letter briefs, Your Honor, the same

17   length?

18         THE COURT:  Five, five and three, yes, that's

19   good.  Five-page opening, five-page answer, three-page reply.

20         Lest there be any -- there will be a fairly

21   lengthy scheduling order.  You should probably put the

22   briefing schedule in the scheduling order that you have

23   agreed on.  I suggest you brief on the Local Rule.  If you

24   find the press of time is going to not enable the Court to

25   have enough time to address any given issue, you might want

43

1    to brief on a more expedited schedule, given that they are

2    only letter briefs, and not a full-blown briefing process.

3                Length of trial.  There is only two matters I

4    have, length of trial and settlement.  We have three patents

5    in this case.

6                MR. SINGER:  Two.

7                THE COURT:  Okay.  I will ask plaintiff first,

8    since you proposed the greatest length of time, why do you

9    think we need two weeks?

10                MR. SINGER:  That was in the event it was a jury

11    trial, Your Honor.

12                THE COURT:  I am saying, why would we need that?

13                MR. SINGER:  Two patents, in terms of both

14    empaneling a jury and also putting forward, I think we will

15    have about three experts, we have two inventors, that was we

16    thought probably three to four trial days for the plaintiff,

17    in terms of also, I don't know what their witness list on the

18    other side is, in terms of who developed the products.

19                THE COURT:  I could see seven days, perhaps.  We

20    will set it down for seven trial days, assuming, again, a

21    jury trial.  You will get, I think, an adequate amount of

22    time each day in front of the jury, no less than five and a

23    half hours to have the jury's attention per day.  We don't

24    spend a lot of time picking juries around here.  Okay?

25    Anything else?

44

1          Settlement.  Have there been discussions?

2          MS. MULLALLY:  We did discuss it.

3          MR. SINGER:  There is not a whole lot there.

4          THE COURT:  Is it the view of the parties that

5     referral to our Magistrate Judge would make sense?

6          MR. SINGER:  I don't think so.

7          THE COURT:  Why do you say that?

8          MR. SINGER:  The issue here, from the plaintiffs'

9     perspective, is vindication of its patent rights.  We believe

10    the right to exclude is sort of the fundamental right of

11    Allergan's.  And there is not, at this juncture, any change

12    from our client's standpoint from that position.

13         MS. MULLALLY:  Our client believes they have the

14    right to be on the market, because Allergan has enjoyed its

15    3.5 years of exclusivity, and that's all they are entitled to

16    because we don't infringe, and the other patent is invalid.

17         THE COURT:  All right.  I will expect to see you

18    at trial.

19         MR. DEVLIN:  Your Honor, the four-month period

20    you would like to have after summary judgment briefing before

21    trial?

22         THE COURT:  Ideally, before the pretrial

23    conference, because if you can get a ruling from me before

24    that time, again, that will affect what you have to do in

25    terms of preparing your pretrial order.

45

1            MR. DEVLIN:  Thank you.

2            THE COURT:  Actually, the pretrial order -- but

3    that's about three weeks.  If you can't work it out so that I

4    get that time period between pretrial order and close of

5    briefing, then just push it.  But it usually works to the

6    disadvantage of the parties.  That means you do work that you

7    may not otherwise have had to do, depending upon how the

8    Court is going to rule, if there is summary judgment.

9            Anything else, counsel?

10           (Conference concluded at 3:07 p.m.)

11                   - - -

12   Reporter:  Kevin Maurer

13

14

15

16

17

18

19

20

21

22

23

24

25