# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., and ALLERGAN SALES, LLC., <br><br> Plaintiffs, <br><br> v. <br><br> ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **Civil Action No: 04-968-GMS** |

## ALCON'S RESPONSES TO ALLERGAN'S
## FIRST SET OF INTERROGATORIES (Nos. 1-7)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendants, Alcon Inc.,

Alcon Laboratories, Inc., and Alcon Research, Ltd. (collectively "Alcon"), hereby respond to the

First Set of Interrogatories (Nos. 1-7) of plaintiffs, Allergan, Inc. and Allergan Sales, LLC

(collectively "Allergan"), with the following objections and answers:

## GENERAL OBJECTIONS

To the extent applicable, Alcon incorporates by reference the General Objections set

forth in its responses to Allergan's First Set of Requests for Production of Documents and

Things (Nos. 1-57), served concurrently herewith.

**SPECIFIC RESPONSES**

**INTERROGATORY NO. 1**

State fully and with particularity all the facts and reasons upon which Alcon bases the contentions made in the Second and Fourth Counterclaims and the Third and Sixth Affirmative Defenses of its Answer and Counterclaims that the patents-in-suit are invalid under 35 U.S.C. §§ 102, 103, and/or 112, including, but not limited to, the identity of the specific statutory provision relied upon for invalidity; the identity of the claim that Alcon contends is rendered invalid; a description of all evidence that Alcon contends renders any claim invalid; a claim chart comparing each and every element of the asserted invalid claims to the location of said claim elements in any asserted prior art; and any portions of the specification or prosecution history of the patents-in-suit relied upon for any invalidity claim; as well as the identity of each person with factual information supporting Alcon's allegations including the nature and extent of the information known to such person and an identification of all documents that refer or relate to Alcon's allegations.

**RESPONSE TO INTERROGATORY NO. 1**

    1.    **The '834 Patent**

The claims of the '834 patent are invalid under 35 U.S.C. § 112 for lack of written description because there is no support in the specification or the claims originally filed in the parent application or the application for the '834 patent for the claim term "up to about 0.15%(w/v)", "about 0.15%(w/v)" or "0.15% (w/v)." Allergan did not cite to any disclosure to support the term when it was introduced by preliminary amendment upon filing of the continuation application. Furthermore, the specification teaches away from a 0.15% limitation in that all compositions disclosed in the specification have a concentration of drug that is 0.2% (w/v) and higher. Thus, all of the claims of the '834 patent are invalid under 35 U.S.C. §112 first paragraph because there is no support for the 0.15% (w/v) limitation in the specification or in the claims originally filed with the parent application.

Also, claims 1-5, 8-14, and 17-18 that do not require an SEC or a preservative are not supported by the specification and are invalid for lack of written description under 35 U.S.C.

-2-

§112 as well, because the specification shows that at least one of such ingredients is always present in the compositions disclosed.

As discussed below, the claims are not supported in the specification or in the original disclosure of the parent application, and therefore they are not entitled to the priority date of the parent application.

The specification of the '834 patent is replete with descriptions of the invention as a composition of the drug with an SEC at higher pHs than had previously been in use. Indeed, the prosecution history of the '834 patent reveals that in prosecuting the USSN 10/236,566 application filed on September 6, 2002, the inventors characterized their invention as "drawn to surprising new therapeutic compositions comprising at least a 25% lower concentration of brimonidine than previous ophthalmic formulations, at pH closer both to the solubility limits of brimonidine, and to the pKa of the compound."

An invention requiring the 0.15% limitation is new matter unsupported by the disclosure of the parent application USSN 09/904,018. The claims of the '834 patent are thus only entitled to the filing date of application USSN 10/236,566, September 6, 2002. Allergan's Alphagan®P product was approved by the FDA on March 16, 2001 and the product label for Alphagan®P was posted on the FDA's website on August 21, 2001, as the "Approved Labeling" for NDA 21-262. That labeling bears a copyright notice dated 2000 and describes the Alphagan®P product as containing 0.15% brimonidine tartrate, with the brimonidine tartrate soluble in the product vehicle at pH 7.2. It also indicates that Alphagan®P product has a pH of 6.6 – 7.4. This posted labeling is prior art under 35 U.S.C. §102 (b) because it was published in August 2001, more than one year prior to the September 6, 2002, filing date of USSN 10/236,566 to which the

-3-

claims of the '834 patent are entitled. Thus, claims 1-7, 10-16, 20 and 22 of the '834 patent are not entitlted to the priority date of July 14, 2000 and are therefore invalid as anticipated over the Alphagan®P product label as prior art under 35 U. S. C. § 102(b).

Claims 8, 9, 17-19 and 21 (i.e., claims that specify that the composition is substantially free of an anionic cellulosic derivative or that the composition comprises benzalkonium chloride as a preservative) are invalid under 35 U.S.C. §103 as obvious over a combination of the posted labeling and Burke U.S. Patent No. 5,215,991. Burke discloses a composition containing an alpha 2 agonist and benzalkonium chloride that is free of an anionic cellulose derivative (see, for example, Table II of Burke).

Furthermore, the claims of the '834 patent are invalid because the best mode of practicing the claimed invention was not disclosed. Nothing in the specification or in the original claims of the '834 patent discloses the claimed compositions as preferred formulations; indeed, the specification does not disclose any formulations with concentrations of up to 0.15% of active ingredient. Yet, Allergan's inventors must have known of the preferred method of practicing the invention when the application that led to the '210 parent patent was filed on July 14, 2000 because Allergan had already selected a 0.15% formulation for its Alphagan®P product.

All claims of the '834 patent are unenforceable because the applications failed to inform the Examiner about the prior public sales of Alphagan®P and publication of the Alphagan®P label.

## 2.    The '337 Patent

-4-

All claims of the '337 patent are invalid for lack of written description under 35 U.S.C. § 112 because the claims do not identify the formula or chemical name of the required SEC, claiming instead through a functional definition. The claims of the '337 patent attempt to claim the genus of SECs by function alone and impermissibly require one to make and test a particular composition in order to determine whether it falls within the scope of the claims. This violates the written description requirement of §112.

All claims of the '337 patent are invalid under 35 U.S.C. §102(b) as anticipated by U.S. Patent No. 5,834,470. The '470 patent discloses alpha-2-adrenergic agonist compositions that comprise quinoxaline alpha-2-agonists and pharmaceutically acceptable carriers. The compositions are useful for treating ocular disorders associated with intraocular pressure and are administered either orally or topically to the surface of the eye. The pharmaceutically acceptable carriers include "cellulose and its derivatives, such as sodium carboxymethyl cellulose." The '470 patent discusses topical ocular compositions:

> Preferred compositions of the subject invention include aqueous solutions comprising a safe and effective amount of a subject compound intended for topical intraocular administration. Such compositions preferably comprise from about 0.0001% to about 5% of a subject compound, more preferably from about 0.01% to about 0.5%. Such compositions also typically include one or more preservatives, such as benzalkonium chloride, thimerosal, phenylmercuric acetate; vehicles, such as poloxamers, modified celluloses, povidone and purified water; tonicity adjustors, …; acids and bases may be used to adjust the pH of these formulations as needed.

col. 10, ll. 38-52.

All claims of the '337 are also invalid under 35 U.S.C. §102(b) as anticipated by U.S. 5,091,528. The '528 patent contains a disclosure of preferred vehicles similar to that contained

-5-

in the Burke '991 patent (cited by the Examiner). The '528 patent, however, also discloses that the reference compositions may be used for the treatment of ocular bleeding. For such use, the compounds are administered to the eye in a pharmaceutical composition. Ophthalmic solutions are one type of preferred carrier, which may contain a thickening agent "such as carboxymethylcellulose or carbopol" to enhance delivery. Carpobol is a polyacrylic acid polymer. Both carboxymethylcellulose and polyacrylic acid polymers are listed as SECs in the '337 patent. Allergan's failure to disclose this Allergan patent as prior art during the prosecution of the '337 patent constitutes inequitable conduct before the PTO. To the extent that the '528 patent does not expressly disclose preservatives for use in the compositions useful for treating ocular bleeding, Claims 9 and 10 of the '337 patent are invalid under 35 U.S.C. §103 as obvious over a combination of the '528 patent and the Burke '991 patent or Beck et al. '933 patent.

All claims of the '337 patent are also invalid under 35 U.S.C. §102(b) as anticipated by U.S. 5,776,445. The '445 patent discloses vehicles for ophthalmic delivery. The vehicles include alginates having a particular proportion of guluronic acid. Specific alginates disclosed in the '445 patent are commercially available sodium alginates. Although the '337 patent does not define SEC's except by example, homopolymers and copolymers of alginic acid and metal alginates are listed as representative SECs (see col. 6, ll. 18 – 61). The '445 patent identifies, as therapeutic agents suitable for use in the formulations containing the alginates, glaucoma agents such as the alpha-2-adrenergic agonist apraclonidine and related 2-substituted amino imidazolines.

Although claims 3 and 4 of the '337 patent are not anticipated by the '445 patent because it does not expressly disclose quinoxaline alpha-2-adrenergic agonists as suitable drugs for the reference vehicles, those claims are invalid under 35 U.S.C §103 as obvious over a combination

-6-

of the '445 patent and the Burke '991 patent. The Burke '991 patent equates clonidine, apraclonidine and brimonidine as "most preferred" imidazolidine-derived alpha-2 agonist compounds.

### 3.  Both Patents

Individuals with pertinent information include the inventors of the patents-in-suit, attorneys who prosecuted the relevant applications, and authors of prior art references.

All non-privileged responsive documents sought by this interrogatory and plaintiffs' document requests will be produced.

Since discovery has just commenced, Alcon reserves the right to supplement this response to the extent further discovery or investigation reveals additional defenses to the validity of either asserted patent.

## INTERROGATORY NO. 2

State fully and with particularity all the facts and reasons upon which Alcon bases the contentions made in the First and Third Counterclaims and the First and Fourth Affirmative Defenses of its Answer and Counterclaims that it will not infringe, either literally or under the doctrine of equivalents, or by inducement or otherwise, each of the patents-in-suit, including an identification of each element of each claim that Alcon alleges it will not meet, an identification of all evidence, both intrinsic and extrinsic, that Alcon intends to rely upon in support of any claim construction advanced to the Court, including an identification of any prosecution history of the patents-in-suit or prior art that Alcon intends to rely upon, an identification and explanation of any claim amendments, arguments, or other statements made during the prosecution history of the patents-in-suit that Alcon alleges estops Allergan from asserting any of the patents-in-suit against Alcon, an identification of each person with factual information that refers or relates to Alcon's allegations including the nature and extent of the information known to each person and an identification of all documents that refer or relate to Alcon's allegations.

## RESPONSE TO INTERROGATORY NO. 2

As demonstrated in its Response to Interrogatory No. 1, both the '834 and '337 patents-in-suit are invalid and, accordingly, will not be infringed by Alcon's sale of its proposed product.

-7-

### 1.    The '834 Patent

Even if valid, the '834 patent will not be infringed by Alcon's proposed product. Based on the specification and the prosecution history, all claims of the '834 patent should be construed as requiring an anionic solubility enhancing component. The specification of the '834 patent describes an invention wherein "[t]he present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions," Summary of the Invention col. 1, lns. 57-61, and "[t]he amount of SEC in the present composition is not of critical importance so long as solubility at [sic] the alpha-2-adrenergic agonist component is a t least somewhat increased and is present in a biologically acceptable amount." Col. 8, lns. 51-54. The specification also discloses only compositions of brimonidine that contain SECs. Therefore, the claims of the '834 patent must also be construed to require an SEC, and the prosecution history, as explained below, requires that that SEC must be an anionic SEC. Alcon's proposed product does not infringe these claims, either literally or under the doctrine of equivalents, because it does not have any solubility enhancing component, because as shown in Figure 1 and Table IV of the '834 patent, brimonidine 0.15% (w/v) is 100% soluble at pH 7.2. The composition of Alcon's proposed product is explicitly shown in Alcon's NDA, which has been provided to Allergan. In addition, Alcon's proposed product does not infringe these claims, either literally or under the doctrine of equivalents, because it does not contain an anionic solubility enhancing agent, the only type which, according to the inventors of the '834 patent, will function in the claimed invention. Rather, Alcon's proposed product contains povidone, an ingredient which, according to the inventors of the '834 patent, will not function in the claimed invention.

-8-

The '834 patent-in-suit is a continuation of the '210 patent and therefore the prosecution history of the latter patent limits the scope of the '834 patent-in-suit. In the prosecution history of the '210 patent (portions of which are also discussed with respect to the '337 patent), Allergan elected to prosecute initial Claims 1-30 in response to a restriction requirement made against the original forty-six claims. The Examiner rejected all thirty claims under 35 U.S.C. §103(a) as unpatentable over Burke (US 5,215,991) in view of Remington's Pharmaceutical Sciences. According to the Examiner, Burke discloses compositions of the same quinoxaline drugs that are recited in Allergan's claims and Burke discloses that those compositions contain solubility enhancing components such as polyvinyl alcohol, polyvinylpyrrolidone, hydroxypropylcellulose, poloxamers, carboxymethylcellulose and hydroxyethylcellulose. In response to this rejection, Allergan obtained an interview with the Examiner on February 25, 2003, and argued that the instant invention was "an invention of selection." In the Amendment submitted by Allergan dated March 11, 2003, Allergan amended independent Claims 1 and 20 so that all of the pending claims would be limited to compositions containing an anionic SEC. According to Allergan, "[t]he current claims are directed to compositions comprising brimonidine and salts and esters thereof in combination with an anionic polymeric solubility enhancing component." Allergan also argued as follows:

> Of the "vehicles" specifically disclosed by the Burke patent, all will function to increase the viscosity of a liquid aqueous composition. However, of these vehicles only carboxymethylcellulose (CMC) is an anionic polymer. All of the other polymers are non-ionic. They may act to increase the solution's viscosity, but they do not have the same characteristics as an anionic polymer such as CMC.

Response to Office Action dated March 11, 2003 at 6.

-9-

In connection with this argument, Allergan submitted a Declaration of Orest Olejnik, Ph.D., one of the inventors, asserting that "anionic solubility enhancing components such as CMC have surprising and beneficial properties in the solubilization of brimonidine as compared to non-ionic or cationic polymers." Although completely lacking any supporting data, Allergan argued to the Examiner that the Declaration stated that "the use of an anionic polymer solubility enhancing component such as CMC (as compared to the nonionic polymer hydroxypropyl methyl cellulose) has the advantage of adsorbing to cellular surfaces . . . in a manner that retains any drug in solution with the CMC to be retained at the ocular surface far longer (and in larger volume) than viscous formulations made with other, non-anionic polymers, while simultaneously increasing solubility." Allergan concluded its argument by emphasizing that the art cited by the Examiner "would not direct or motivate the person of ordinary skill in the art to select or want to select an anionic polymeric solubility enhancing component such as CMC from the list of optional viscous 'vehicles' contained in the [Burke] patent."

According to the prosecution history of the '210 patent, the anionic nature of the solubility enhancing component is critical. Although Allergan initially presented broad claims that required any "solubility enhancing component," the Examiner did not allow any claims until Allergan amended the claims to limit the solubility enhancing component to an anionic solubility enhancing component. Allergan secured issuance of the patent only after emphasizing that its invention was a selection invention and that anionic solubility enhancing components were surprisingly and unexpectedly different than nonionic or cationic polymeric solubility enhancing components. Accordingly, it is unquestionably clear, in view of the prosecution history of the '210 patent, the parent of the '834 patent, that Allergan is estopped from asserting

-10-

that the '834 patent's claims cover any compositions that do not contain an anionic solubility enhancing component.

Individuals with information include the inventors of the '834 patent-in-suit, and the attorneys prosecuting such patent application. Pertinent documents include the prosecution histories of the relevant patents and Alcon's NDA for its proposed product.

### 2.    The '337 Patent

In view of the prosecution history, all claims of the '337 patent should be interpreted as requiring an anionic solubility enhancing component. Alcon's proposed product does not infringe these claims, literally or under the doctrine of equivalents, because it does not have a solubility enhancing component nor an anionic solubility enhancement component (see description above in section 1 of this interrogatory response). *See also* discussion of prosecution history of the '210 patent above.

The '337 patent issued from USSN 10/299,386, filed Nov. 19, 2002, which was a divisional application from USSN 09/904,018 (now U.S. Patent No. 6,627,210), filed on July 10, 2001. The '210 patent is discussed above. When the application that led to the '210 patent was filed, the Patent Office restricted the claims into four groups: I. Claims 1-30 drawn to a composition; II. Claims 31-33, drawn to a complex; III. Claims 34-39, drawn to an oligomer; and IV. Claims 40-46, drawn to a composition comprising an oxychloro component. In response, the applicants elected to pursue the invention of Group I in the application that led to the '210 patent. Allergan filed a divisional application, USSN 10/299,386, to pursue the invention of Group IV (original Claims 40 – 46, drawn to a composition comprising an oxychloro component).

In the first Office Action (mailed March 13, 2003) issued for USSN 10/299,386, the Examiner rejected Claims 40-43 under the doctrine of obviousness-type double patenting as unpatentable over Claims 47-77 of USSN 10/236,566 (which issued as US 6,641,834) and over Claims 1-52 of USSN 09/903,962 (which issued as US 6,562,873). The Examiner concluded that the present application and both cited applications claimed an alpha-2-adrenergic agonist with an oxy-chloro component. The Examiner also rejected Claims 40-46 as obvious over Burke, US 5,215,991, in view of Beck et al., US 6,358,935. According to the Examiner, Burke discloses compositions that contain brimonidine from about 0.001 – about 1.0% w/v. The Examiner also noted that Burke discloses that benzalkonium chloride may be used as a preservative and that suitable vehicles included carboxymethyl cellulose. The only limitation that the Examiner did not find expressly disclosed in Burke is the requirement that the preservative be a "chlorite component." The Examiner cited Beck et al. for this disclosure.

In response to the March 13, 2003, Office Action, Allergan amended the pending claims to eliminate the requirement for an oxychloro component despite the fact that this was the very basis for the restriction requirement imposed in USSN 09/904,018 and the characterization of USSN 10/299,386 as a "divisional" patent application. As a result, the amended claims were essentially the same claims that the Examiner refused to allow in USSN 09/904,018 (the parent application and now the '210 patent). In that parent application, the Examiner only allowed claims that limited the SEC to polyanionic/anionic SECs after Allergan argued that anionic polymers were different than the other polymers disclosed in the prior art (i.e., polyvinyl alcohol, polyvinylpyrrolidone, hydroxypropylcellulose, poloxamers, and hydroxyethylcellulose) and only after Allergan presented a Declaration of Orest Olejnik, Ph.D., asserting that "anionic solubility

-12-

enhancing components such as CMC have surprising and beneficial properties in the
solubilization of brimonidine as compared to non-ionic or cationic polymers."

As discussed above, while prosecuting the parent application (USSN 09/904,018),
Allergan distinguished CMC from the other vehicles disclosed in the Burke reference (US
5,215,991) cited by the Examiner.  Allergan argued to the Examiner that CMC was special
among vehicles, specifically the vehicles disclosed in the Burke '991 patent.  *See*, for example,
Allergan's March 11, 2003 Response to the Office Action dated January 15, 2003, at page 6, 5th
paragraph:

> Of the "vehicles" specifically disclosed by the Burke patent, all
> will function to increase viscosity of a liquid aqueous composition.
> However, of these vehicles only carboxymethylcellulose (CMC) is
> an anionic polymer.  All of the other polymers are non-ionic.  They
> may act to increase the solution's viscosity, but they do not have
> the same characteristics as an anionic polymer such as CMC.

With its March 11, 2003, Response, Allergan also submitted a Declaration of Orest
Olejnik, Ph.D., the first-named inventor of the '873, '210, '834, and 337 patents.  In Dr.
Olejnik's Declaration, he describes the cited Burke patent as disclosing "a multitude of different
ingredients that may be contained in formulations containing brimonidine; among these are
mentioned optional 'vehicles' which may include, without limitation, polyvinyl alcohol.
Povidone (polyvinylpyrrolidone), hydroxypropylcellulose, poloxamers, carboxymethylcellulose
(CMC), and hydroxyethylcellulose."  Dr. Olejnik asserts that neither Burke nor a Remington
reference cited by the Examiner for disclosing that the polymers in Burke may be used as
viscosity-increasing agents discloses that CMC would have any characteristics that would
motivate a person of ordinary skill in the art to choose it over other polymers in formulating a
brimonidine solution.  Dr. Olejnik then states that CMC, unlike the other polymers disclosed in

-13-

Burke, possesses the "surprising advantages of both increasing the solubility of brimonidine in

solution…and causing such solutions to have superior adherence to cell surfaces, including

ocular surfaces such as the cornea." Dr. Olejnik then concludes that the other polymers

disclosed in Burke would not be suitable for use in the invention:

> It is also my belief that brimonidine solutions made using the other "vehicles" mentioned in the Burke patent would not possess this surprising combination of advantages. Therefore, the disclosures of Burke and Remington's in no way would render the presently claimed compositions obvious to the worker of ordinary (or even extraordinary) skill in the art.

Declaration of Orest Olejnik, Ph.D. (not dated) at paragraph 8 submitted with Allergan's March

11, 2003 Response.

Thus, because the prosecution history of the '210 patent defines the scope of the

invention and limits the SEC component to an "anionic" SEC , that same SEC component in the

claims of the '337 should be similarly limited. This is especially true in light of Dr. Olejnik's

statement that anything other than an anionic SEC would not work in the invention. Also,

because the Examiner rejected the claims over the same prior art reference as in the '210 patent,

the same limitation to the claims should have been required to overcome that same rejection.

Properly construed, the claims of '337 patent will be not infringed by Alcon's proposed product

because the SEC component must be limited to an anionic SEC, and Alcon's proposed product

does not contain any anionic SEC component.

Moreover, Alcon's proposed product does not infringe the claims of the '337 patent

because it does not contain an SEC. Although Alcon's product contains povidone, which the

'337 patent identifies as a potential SEC, Figure 1 makes it clear that at a concentration of 0.15%

brimonidine is fully soluble at PH 7.2  Therefore, in Alcon's proposed 0.15% brimonidine

-14-

product which is formulated at pH 7.2, povidone cannot be acting as an SEC but rather it is a

viscosity enhancer or a "suspending agent" (*see* col. 11, ll.. 56-60). Furthermore, as described

above, the inventors have specifically stated that povidone is not an SEC that will work in the

claimed invention.

Individuals with information include the inventors of the '337 patent-in-suit and the

attorneys prosecuting such patent application. Pertinent documents include the prosecution

histories and Alcon's NDA for its proposed product.

### 3.  Both Patents

Since discovery just commenced, Alcon reserves the right to supplement this response to

the extent further discovery or investigation reveals additional defenses to infringement of either

asserted patent.

### INTERROGATORY NO. 3

State fully and with particularity all the facts and reasons upon which Alcon bases its
contention as expressed on pages 8-12 of its Paragraph 4 letter to Allergan that povidone is not a
solubility enhancing component.

### RESPONSE TO INTERROGATORY NO. 3

Alcon asserts that povidone, as utilized as a component in the accused product, is not a

solubility enhancing component as that term is defined in the patents-in-suit, in particular in the

claims of the '337 patent. The data provided in the patents-in-suit show that, at the concentration

used in Alcon's proposed product, brimonidine is fully soluble at pH 7.2 and, thus, a solubility

enhancing agent is not, by Allergan's own definition, present in Alcon's proposed product.

Moreover, during prosecution, the inventors of the patent-in-suit specifically disavowed

-15-

povidone as a solubility enhancing component that is useful in their invention. <u>See</u> <u>also</u>
Response to Interrogatory No. 2 herein.

## INTERROGATORY NO. 4

State fully and with particularity all the facts and reasons upon which Alcon bases its contention that it has not willfully infringed any claim of the patents-in-suit, including, but not limited to, identifying any opinion, oral or written, received by Alcon concerning the patents-in-suit, the author(s) of any such opinion, the recipient(s) of any such opinion, any persons with knowledge of any such opinion, and all documents that refer or relate to any such opinion.

## RESPONSE TO INTERROGATORY NO. 4

Alcon objects to Interrogatory 4 on the grounds that discovery on the issue of willful

infringement is impermissible unless and until the Court decides that such claim may be asserted

by Allergan. Accordingly, Alcon objects to responding to this interrogatory at this time.

## INTERROGATORY NO. 5

Describe fully and with particularity all the facts and circumstances surrounding the decision to file Alcon's NDA referred to in Alcon's Paragraph 4 letter, including, but not limited to, the date the idea to file the NDA first occurred; the reasons for pursuing the NDA; the names and addresses of the people involved in making the decision to pursue the NDA; the circumstances under which the decision to file the NDA was made; the facts considered in deciding whether to file the NDA; the identity and description of any information obtained from third parties used or relied upon in making the decision to pursue the NDA; all actions taken regarding the NDA between the date the idea to file the NDA first occurred and the present day; the names and addresses of all persons who have knowledge of the foregoing matters; and identification of all documents that refer or relate to the foregoing matters.

## RESPONSE TO INTERROGATORY NO. 5

Alcon objects to this Interrogatory 5 as seeking information that is not relevant to any

issue in this action and not reasonably calculated to lead to the discovery of admissible evidence.

Alcon further objects to this interrogatory to the extent that it seeks information protected from

discovery by the attorney-client, attorney-work product or other privilege. Alcon also objects to

this interrogatory on the grounds that discovery on the issue of willful infringement is

-16-

impermissible unless and until the Court decides that such claim may be asserted by Allergan.

Subject to and without waiving the foregoing general and specific objections, Alcon responds

pursuant to Rule 33(d) that it will produce all non-privileged documents related to all aspects of

the research and development of its proposed product which will also be sufficient to identify all

persons with knowledge of the research and development of the product, Alcon further notes that

its NDA for the proposed product has already been provided to Allergan in its entirety.

## INTERROGATORY NO. 6

Identify the persons within Alcon most knowledgeable regarding: a) medicaments for
lowering intraocular pressure; b) glaucoma medicaments; c) Alcon's NDA; d) any research
performed by or for or sponsored by Alcon on the uses, effects, and/or properties of brimonidine
and/or povidone; and e) any research performed by or for or sponsored by Alcon on the uses,
effects, and/or properties of povidone.

## RESPONSE TO INTERROGATORY NO. 6

Alcon objects to Interrogatory 6 as overly broad, unduly burdensome and as seeking

information that is not relevant to any issue in this action and not reasonably calculated to lead to

the discovery of admissible evidence.  Subject to and without waiving the foregoing general and

specific objections, Alcon responds pursuant to Rule 33(d) that it will produce all non-privileged

documents related to all aspects of the research and development of its proposed product which

will also be sufficient to identify all persons with knowledge of the research and development of

the product, Alcon further notes that its NDA for the proposed product has already been provided

to Allergan in its entirety.

## INTERROGATORY NO. 7

Describe fully and with particularity the development of Alcon's proposed brimonidine
product, including, but not limited to, all of the formulations considered, the reasons for any
changes in formulation, the results of all testing performed, as well as the identity of each person
with factual information regarding the development including the nature and extent of the

-17-

information known to such person and an identification of all documents that refer or relate to the development.

## RESPONSE TO INTERROGATORY NO. 7

Alcon objects to Interrogatory 7 as overly broad, unduly burdensome and as seeking information that is not relevant to any issue in this action and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing general and specific objections, Alcon responds pursuant to Rule 33(d) that it will produce all non-privileged documents related to all aspects of the research and development of its proposed product which will also be sufficient to identify all persons with knowledge of the research and development of the product. Alcon further notes that its NDA for the proposed product has already been provided to Allergan in its entirety.

As to objections only,

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (203) 571-1253

Attorneys for defendants
Alcon, Inc., Alcon Laboratories, Inc.
and Alcon Research, Ltd.

-18-

63534.1001

Of Counsel

Daniel J. Thomasch
Brian D. Coggio
M. Veronica Mullally
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103
Tel:  (212) 506-5000
Fax  (212) 506-5151

Dated:December 27, 2004

-19-

## VERIFICATION

STATE OF TEXAS          )
                        ) SS:
COUNTY OF TARRANT       )


**Patrick Ryan**, being first duly sworn, deposes and says that he is Assistant General
Counsel for Alcon Research, Ltd. and is authorized to verify these responses on behalf of Alcon
Inc., Alcon Laboratories, Inc., and Alcon Research, Ltd.. While he does not have personal
knowledge of all the facts recited in Alcon Inc., Alcon Laboratories, Inc., and Alcon Research,
Ltd.'s Response to  Allergan's First Set of Interrogatories (Nos. 1-7) in the case of <u>Allergan, Inc.
and Allergan Sales, LLC. v. Alcon Inc., Alcon Laboratories, Inc., and Alcon Research, Ltd.,</u>
Civil Action No.: 04-968-GMS, the information contained in these responses has been collected
and made available to him by others. These responses are true to the best of his knowledge and
belief based upon the information made available to him. Therefore the statements made in these
responses are verified on behalf of Alcon Inc., Alcon Laboratories, Inc., and Alcon Research,
Ltd. in this litigation.


Patrick Ryan
Assistant General Counsel
Alcon Research, Ltd.


SWORN AND SUBSCRIBED TO before
me in my presence on this
17th day of December 2004

Notary Public

My commission expires: 12-7-2005

JEANNIE BURKE
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 12-07-2005

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire hereby certify that copies of the foregoing document

were caused to be served on December 27, 2004 upon the following counsel of record:

### BY HAND DELIVERY

William J. Marsden, Jr., Esquire
Fish & Richardson, P.A.
919 N. Market Street, Suite 1100
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Jonathan E. Singer, Esquire
Fish & Richardson, P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

John W. Shaw (No. 3362)

WP3:1036642.1          63534.1001

# Exhibit  F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., and ALLERGAN SALES, LLC., <br><br> Plaintiffs, <br><br> v. <br><br> ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **Civil Action No: 04-968-GMS** |

## ALCON'S CLAIM CHART

Defendants, Alcon Inc., Alcon Laboratories, Inc. and Alcon Research, Ltd. (collectively, "Alcon") submit their claim chart herewith. For ease of comparison and review, Alcon has utilized the claim limitations set forth in plaintiffs' claim chart.

**The '337 Patent**

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| 1. A therapeutically effective ophthalmic composition comprising: | The claim requires a therapeutically effective ophthalmic composition. | To the extent that Allergan is using the term "therapeutically effective" in its ordinary sense, Alcon does not disagree with Allergan's proposed construction. | Although the specification and prosecution history of the '337 patent use the term "therapeutically effective," they provide no teaching or guidance as to any specific meaning of this term or the characteristics of compositions exhibiting such property, nor do they limit the broad scope of the term in any way. |
| an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient in whom the composition is administered; and | The claimed composition contains an alpha-2-adrenergic agonist component, and that component must be present in an amount that is effective to provide a therapeutic benefit to a patient. | To the extent that Allergan is using the term "an amount that is effective to provide therapeutic benefit" in its ordinary sense, Alcon agrees with Allergan's proposed construction that the claimed composition must contain an alpha-2-adrenergic agonist component (which is a component that acts on or binds to alpha-2-adrenergic receptors) in an amount that is effective to provide a therapeutic benefit to a patient. | Although the specification and prosecution history of the '337 patent refer to the use of "alpha-2-adrenergic agonist components" (see '337 patent specification at Col. 1, lns. 20-23) as "therapeutic agents," they provide no teaching or guidance that identifies what amount constitutes "an amount effective to provide a therapeutic benefit . . ." nor do they identify the characteristics of compositions exhibiting such property, nor do they limit the broad scope of the term in any way. |
| a solubility enhancing component other than a cyclodextrin in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the | The claimed composition contains a solubility enhancing component, which is a component that enhances the solubility of the alpha-2-adrenergic agonist component, and any solubility enhancing | The claimed composition must contain an anionic component, other than a cyclodextrin, in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of the alpha-2- | Application No. 09/904,018 (parent application of the application which issued as the '337 patent): Interview Summary, mailed 3/3/03; Reply to Office Action, received by the PTO March 17, 2003 including Declaration of Orest Olejnik; '337 patent, Reply to Office Action, dated June 16, 2003. |

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component. | component other than a cylclodextrin is covered by the claim. The solubility enhancing component must be present in such an amount that the solubility of the alpha-2-adrenergic agonist component in the composition is increased relative to its solubility in a similar composition without the solubility enhancing component. | adrenergic agonist component in an otherwise identical composition without the anionic component. In addition, the "solubility enhancing component" cannot be polyvinyl alcohol, povidone (polyvinylpyrrolidone), hydroxypropylcellulose, poloxamers or hydroxymethylcellulose. | |
| **Claim 2** | | | |
| 2. The composition of claim 1 wherein the alpha-2- adrenergic component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, derivatives thereof, and mixtures thereof. | Claim 2 contains all the limitations of claim 1, with the additional requirement that the alpha-2-adrenergic agonist component is one of the following: an imino-imidazoline, imidazoline, imidazole, azepine, thiazine, oxazoline, guanidine, catecholamine, derivative thereof, or mixture thereof. | Claim 2 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the additional requirement that the alpha-2-adrenergic agonist component must be: an imino-imidazoline, imidazoline, imidazole, azepine, thiazine, oxazoline, guanidine, catecholamine, a derivative of one of the foregoing, or a mixture of two or more of the foregoing. | As relevant to the construction of claim 2, Alcon incorporates its comments to claim 1. |
| **Claim 3** | | | |
| 3. The composition of claim 1 wherein the therapeutically active | Claim 3 includes all the limitations of claim 1, with the further requirement that | Claim 3 contains all the limitations of claim 1 as construed above by Alcon and | As relevant to the construction of claim 3, Alcon incorporates its comments to claim 1. |

-2-

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| component includes a quinoxaline component. | the composition contain a quinoxaline component. | incorporated herein, with the further requirement that the composition must contain a quinoxaline component. | |
| **Claim 4** | | | |
| 4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, derivatives thereof, and mixtures thereof. | Claim 4 contains all the limitations of claim 3, with the further requirement that the quinoxaline component must be quinoxaline, derivatives of quinoxaline, or mixtures of quinoxaline. | Claim 4 contains all the limitations of claims 1 and 3 as construed above by Alcon and incorporated herein, with the further requirement that the quinoxaline component must be a quinoxaline, a derivative of quinoxaline, or a mixture of two or more of the foregoing. | As relevant to the construction of claim 4, Alcon incorporates its comments to claims 1 and 3. |
| **Claim 6** | | | |
| 6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2- adrenergic agonist component relative to the solubility in a biological environment of an identical alpha-2- adrenergic agonist component in a similar composition without the solubility enhancing component. | Claim 6 includes all the limitations of claim 1, with the further requirement that the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2-adrenergic agonist component relative to its solubility in a composition without the solubility enhancing component. | Claim 6 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the further requirement that the "solubility enhancing component" must be effective to increase the solubility in a biological environment of the alpha-2- adrenergic agonist component relative to the solubility in an identical biological environment of the alpha-2-adrenergic agonist component in an otherwise identical composition without the "solubility enhancing | As relevant to the construction of claim 6, Alcon incorporates its comments to claim 1. In addition, the specification and prosecution history of the '337 patent provide no teaching or guidance regarding the meaning of "biological environment" or the testing of solubility "in a biological environment" with or without a "solubility enhancing component" or the characteristics of those compositions exhibiting the properties specified in claim 6, nor do they limit the broad scope of these terms in any way. |

-3-

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| | | component." | |
| **Claim 9** | | | |
| 9. The composition of claim 1 which further comprises an effective amount of a preservative. | Claim 9 includes all the limitations of claim 1 with the further requirement that the composition must contain a component that assists in the preservation of the composition. | Claim 9 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein. Alcon does not otherwise disagree with Allergan's construction of the additional limitation of claim 9. | As relevant to the construction of claim 9, Alcon incorporates its comments to claim 1. |
| **Claim 10** | | | |
| 10. The composition of claim 6 which further comprises an effective amount of a preservative. | Claim 10 includes all the limitations of claim 6 with the further requirement that the composition must contain an effective amount of a component that assists in the preservation of the composition. | Claim 10 contains all the limitations of claim 6 as construed above by Alcon and incorporated herein. Alcon does not otherwise disagree with Allergan's construction of the additional limitation of claim 10. | As relevant to the construction of claim 10, Alcon incorporates its comments to claims 1 and 6. |

DOCSNY1:1115055.1
11716-2004 VM2

**The '834 Patent**

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| **Claim 1** | | | |
| 1. A therapeutically effective aqueous ophthalmic composition comprising: | The claim requires a therapeutically effective aqueous ophthalmic composition. | To the extent that Allergan is using the term "therapeutically effective" in its ordinary sense, Alcon does not disagree with Allergan's proposed construction. | Although the specification and prosecution history of the '834 patent use the term "therapeutically effective," they provide no teaching or guidance as to any specific meaning of this term or the characteristics of compositions exhibiting such property, nor do they limit the broad scope of the term in any way. |
| up to about 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, | The claimed composition contains up to approximately 0.15% brimondine tartrate. | The claimed composition must contain up to 0.1501% (w/v) (the upper limit of 0.15 ± 0.0001% (w/v)) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate. | The specification (including the claims as originally filed) and prosecution history of the '834 patent provide no teaching or guidance supporting the terms "up to about 0.15% (w/v)," "up to 0.15% (w/v)," or "about 0.15% (w/v)" nor do they disclose that such compositions are within the scope of the alleged invention. However, Table IV shows that the % concentration (w/v) can be measured within 0.0001%. |
| the composition having a pH of about 7.0 or greater, | The claimed composition has a pH of approximately 7.0 or greater. | The composition must have a pH of 7.0 ± 0.01 or greater. | The specification of the '834 patent at Figure 1 and Tables II and IV. Application No. 10/236,566: Preliminary amendment September 6, 2002; Summary of Interview on February 25, 2003; Reply to Office Action received by the PTO March 28, 2003; Undated Declaration of Amy Batoosingh, received by the PTO March 24, 2003 and accompanying article Katz et al. , J. |

-5-

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| | | | Glaucoma, 11( 2); 119 (2002). |
| and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at about 21° C. | The brimonidine tartrate must be soluble in the composition at approximately 21° C. | The 5-bromo-6-(2- imidozolin-2-ylamino) quinoxaline tartrate must be soluble in the composition at 21 ±1° C by virtue of a "solubility enhancing component" present in an amount effective to enhance the solubility of the quinoxaline component. | '834 patent: Abstract; col. 1, lns. 15-19; 57-64; col. 2, ln. 9-col. 3, ln. 17; col. 4, lns. 11 – 65; col. 5, lns. 59-64; col.6, ln.18- col. 9., ln. 22; col. 13, ln. 49; Table IV; Example 1; and Example 2. |
| **Claim 2** | | | |
| 2. The composition of claim 1 which includes up to 0.15% (w/v) of 5-bromo-6- (2-imidozolin-2-ylamino) quinoxaline tartrate. | Claim 2 includes all the limitations of claim 1, with the additional requirement that the composition must include up to 0.15% brimonidine tartrate. | Claim 2 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include up to 0.15 % (w/v) 5-bromo-6- (2-imidozolin-2-ylamino) quinoxaline tartrate. | As relevant to the construction of claim 2, Alcon incorporates its comments to claim 1. |
| **Claim 3** | | | |
| 3. The composition of claim 1 which includes about 0.15% (w/v) of 5-bromo-6- (2-imidozolin-2-ylamino) quinoxaline tartrate. | Claim 3 includes all the limitations of claim 1, with the additional requirement that the composition must include approximately 0.15% brimonidine tartrate. | Claim 3 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include 0.15% ± 0.0001% (w/v) 5-bromo-6- (2-imidozolin-2-ylamino) quinoxaline tartrate. | As relevant to the construction of claim 3, Alcon incorporates its comments to claim 1. |
| **Claim 4** | | | |

DOCSNY1:1115055.1
11716-2004 VM2

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| | | | |
| 4. The composition of claim 1 which includes 0.15% (w/v) of 5-bromo-6-(2- imidozolin-2-ylamino) quinoxaline tartrate. | Claim 4 includes all the limitations of claim 1, with the additional requirement that the composition must include 0.15% brimonidine tartrate. | Claim 4 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include 0.15% (w/v) 5-bromo-6-(2- imidozolin-2-ylamino) quinoxaline tartrate. | As relevant to the construction of claim 4, Alcon incorporates its comments to claim 1. |
| Claim 5 | | | |
| 5. The composition of claim 1 having a pH of 7.0 or greater. | Claim 5 includes all the limitations of claim 1, with the additional requirement that the pH of the composition must be 7.0 or greater. | Claim 5 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, with the additional requirement that the pH of the composition must be 7.0 or greater. | As relevant to the construction of claim 5, Alcon incorporates its comments to claim 1. |
| Claim 6 | | | |
| 6. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition. | Claim 6 includes all the limitations of claim 1 and further requires that the composition contain either an oxy-chloro or quaternary ammonium preservative in an amount effective to assist in preserving the composition. | Claim 6 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein, and further requires that the composition must contain either an oxy-chloro or quaternary ammonium preservative in an amount effective to assist in preserving the composition. | As relevant to the construction of claim 6, Alcon incorporates its comments to claim 1. |

-7-

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| | | | |
| **Claim 8** | | | |
| 8. The composition of claim 1 which is substantially free of anionic cellulosic derivatives. | Claim 8 includes all the limitations of claim 1 and further requires that the composition is substantially free of anionic cellulosic derivatives. | Claim 8 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein and further requires that the composition is substantially free of anionic cellulosic derivatives. | As relevant to the construction of claim 8, Alcon incorporates its comments to claim 1. |
| **Claim 9** | | | |
| 9. The composition of claim 1 which is substantially free of carboxymethyl cellulose. | Claim 8 [*sic*: 9] includes all the limitations of claim 1 and further requires that the composition is substantially free of carboxymethyl cellulose. | Claim 9 contains all the limitations of claim 1 as construed above by Alcon and incorporated herein and further requires that the composition is substantially free of carboxymethyl cellulose. | As relevant to the construction of claim 9, Alcon incorporates its comments to claim 1. |
| **Claim 10** | | | |
| 10. A therapeutically effective aqueous ophthalmic composition comprising: | The claim requires a therapeutically effective aqueous ophthalmic composition. | To the extent that Allergan is using the term "therapeutically effective" in its ordinary sense, Alcon does not disagree with Allergan's proposed construction. | Although the specification and prosecution history of the '834 patent use the term "therapeutically effective," they provide no teaching or guidance as to any specific meaning of this term or the characteristics of compositions exhibiting such property, nor do they limit the broad scope of the term in any way. |
| up to about 0.15% (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2- | The claimed composition contains up to approximately 0.15% brimonidine, salts of | The claimed composition must contain up to 0.1501% (w/v) (the upper limit of 0.15 ± 0.0001% (w/v)) of 5- bromo-6-(2- | The specification (including the claims as originally filed) and prosecution history of the '834 patent provide no teaching or guidance supporting the terms "up to about 0.15% |

DOCSNY1:1115055.1
11716-2004 VM2

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| ylamino) quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof, | brimonidine, esters of brimonidine, or mixtures of the foregoing. | imidozolin-2- ylamino) quinoxaline, a salt of 5- bromo-6-(2-imidozolin-2- ylamino) quinoxaline, an ester of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or a mixture of two or more of the foregoing. | (w/v)," "up to 0.15% (w/v)," or "about 0.15% (w/v)" nor do they disclose that such compositions are within the scope of the alleged invention.  However, Table IV shows that the % concentration (w/v) can be measured within 0.0001%. |
| the composition having a pH of about 7.0 or greater, | The claimed composition has a pH of approximately 7.0 or greater. | The composition must have a pH of 7.0 ± 0.01 or greater. | The specification of the '834 patent at Figure 1 and Tables II and IV.  Application No. 10/236,566: Preliminary amendment September 6, 2002; Summary of Interview on February 25, 2003;  Reply to Office Action received by the PTO March 28, 2003; Undated Declaration of Amy Batoosingh, received by the PTO March 24, 2003 and accompanying article Katz et al. , J. Glaucoma, 11( 2); 119 (2002). |
| and the component being soluble in the composition at about 21° C. | The brimonidine component must be soluble in the composition at approximately 21° C. | The component must be soluble in the composition at 21 ±1° C by virtue of a "solubility enhancing component" present in an amount effective to enhance the solubility of the component. | '834 patent: Abstract; col. 1, lns. 15-19; 57-64; col. 2, ln. 9-col. 3, ln. 17; col. 4, lns. 11 – 65; col. 5, lns. 59-64; col.6, ln.18- col. 9., ln. 22; col. 13, ln. 49; Table IV;Example 1; and Example 2. |

DOCSNY1:1115055.1
11716-2004 VM2

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| **Claim 11** | | | |
| 11. The composition of claim 10 which includes up to 0.15% (w/v) of the component. | Claim 11 includes all the limitations of claim 10, with the additional requirement that the composition must include up to 0.15% of the brimonidine component. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include up to 0.15% (w/v) of the component listed in claim 10. | As relevant to the construction of claim 11, Alcon incorporates its comments to claim 10. |
| **Claim 12** | | | |
| 12. The composition of claim 10 which includes about 0.15% (w/v) of the component. | Claim 12 includes all the limitations of claim 10, with the additional requirement that the composition must include approximately 0.15% of the brimonidine component. | The claimed composition must include all the limitations of claim 10 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include $0.15 \pm 0.0001\%$ (w/v) of the component listed in claim 10. | As relevant to the construction of claim 12, Alcon incorporates its comments to claim 10. |
| **Claim 13** | | | |
| 13. The composition of claim 10 which includes 0.15% (w/v) of the component. | Claim 13 includes all the limitations of claim 10, with the additional requirement that the composition must include 0.15% of the brimonidine component. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and incorporated herein, with the additional requirement that the composition must include 0.15% (w/v) of the component listed in claim 10. | As relevant to the construction of claim 13, Alcon incorporates its comments to claim 10. |

DOCSNY1:1115055.1
11716-2004 VM2

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| **Claim 14** | | | |
| 14. The composition of claim 10 having a pH of 7.0 or greater. | Claim 14 includes all the limitations of claim 10, with the additional requirement that the pH of the composition must be 7.0 or greater. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and incorporated herein, with the additional requirement that the pH of the composition must be 7.0 or greater. | As relevant to the construction of claim 14, Alcon incorporates its comments to claim 10. |
| **Claim 17** | | | |
| 17. The composition of claim 10 which is substantially free of anionic cellulosic derivatives. | Claim 17 includes all the limitations of claim 10 and further requires that the composition is substantially free of anionic cellulosic derivatives. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and further requires that the composition must be substantially free of anionic cellulosic derivatives. | As relevant to the construction of claim 17, Alcon incorporates its comments to claim 10. |

-11-

| Asserted Claim | Allergan's Construction | Alcon's Construction | Alcon's Evidence Relevant To Claim Construction |
|---|---|---|---|
| **Claim 18** | | | |
| 18. The composition of claim 10 which is substantially free of carboxymethyl cellulose. | Claim 18 includes all the limitations of claim 10 and further requires that the composition is substantially free of carboxymethyl cellulose. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and further requires that the composition must be substantially free of carboxymethyl cellulose. | As relevant to the construction of claim 18, Alcon incorporates its comments to claim 10. |
| **Claim 20** | | | |
| 20. The composition of claim 10 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition. | Claim 20 includes all the limitations of claim 10 and further requires that the composition contain either an oxy-chloro or quaternary ammonium preservative in an amount effective to assist in preserving the composition. | The claimed composition includes all the limitations of claim 10 as construed above by Alcon and further requires that the composition must contain either an oxy-chloro or quaternary ammonium preservative in an amount effective to assist in preserving the composition. | As relevant to the construction of claim 20, Alcon incorporates its comments to claim 10. |

-12-

Dated:  April 5, 2005

*Veronica Mullally*

Daniel J. Thomasch
Brian D. Coggio
M. Veronica Mullally
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY  10103
Tel:  (212) 506-5000
Fax  (212) 506-5151


Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
Wilmington, Delaware  19801
Tel:  (302) 571-6600
Fax:  (203) 571-1253


Attorneys for Defendants
Alcon, Inc., Alcon Laboratories, Inc.,
and Alcon Research, Ltd.