IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., ALLERGAN SALES, LLC,

        Plaintiffs,

      v.

ALCON, INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD.,

        Defendants.

Civil Action No. 04-968-GMS

**PUBLIC VERSION**

**PLAINTIFFS ALLERGAN, INC. AND ALLERGAN SALES, LLC'S
OPPOSITIONS TO ALCON'S MOTION *IN LIMINE* 1-5**

William J. Marsden, Jr. (marsden@fr.com)
Sean P. Hayes (hayes@fr.com)
FISH & RICHARDSON P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070

Jonathan E. Singer
Michael J. Kane
Deanna J. Reichel
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070

Juanita Brooks
W. Chad Shear
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070

Attorneys for Plaintiffs
ALLERGAN, INC. and ALLERGAN SALES, LLC

Dated: January 17, 2006
Public Version filed: January 24, 2006

# TABLE OF CONTENTS

**Page**

I. ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE OF ALLEGED SUPERIORITY OR COPYING...............................1

    A.    Introduction.................................................................................1

    B.    Legal Standard ..........................................................................1

    C.    Argument ....................................................................................2

            1.    The Evidence of Commercial Success Is Compelling and Must Be Considered ........................2

            2.    The Evidence of Copying Is Compelling and Must Be Considered ....................................................3

                    a.    The purported "differences" go, if anything, to the weight of the copying argument. ...................................................4

                    b.    Alcon knowingly chose to formulate in a certain way to take advantage of Alphagan® P......................................5

    D.    Conclusion .................................................................................5

II. ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO PRECLUDE DR. WILSON FROM OFFERING OPINION TESTIMONY REGARDING THE STATISTICAL ANALYSIS OF HIS STUDENT'S SOLUBILITY MEASUREMENTS ........................................................6

    A.    Introduction................................................................................6

    B.    Facts .............................................................................................6

    C.    Legal Standard ..........................................................................7

    D.    Argument ....................................................................................9

            1.    Dr. Wilson should not be precluded from offering testimony regarding ANOVA, the very method internally chosen by Alcon, or its use in this case.....................................................................9

            2.    The '337 patents use of "regression analysis" is completely irrelevant as that is to an entirely different issue.......................................................9

i

## TABLE OF CONTENTS (cont'd)

**Page**

3.    Allergan has produced all of the requested materials. .................................................................10

E.    Conclusion ..........................................................................10

III.    ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO EXCLUDE OPINIONS OF DR. VALENTINO STELLA PERTAINING TO THE ALLEGED INFRINGEMENT OF CLAIM 6 OF THE '337 PATENT .................11

A.    Introduction ........................................................................11

B.    Argument ............................................................................11

    1.    Alcon's argument improperly imports limitations into the claim..........................................................11

    2.    Dr. Stella's interpretation is reasonable and comports with the intrinsic evidence. ....................12

    3.    The experts and specification all agree on the importance of pH. ..............................................12

C.    Legal Standard ....................................................................13

    1.    The specification is the best guide to claim construction...................................................................13

    2.    It is proper for the court to consider expert testimony on claim construction and infringement.................................................................13

D.    Conclusion ..........................................................................14

IV.    ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO EXCLUDE OPINIONS OF DR. STELLA PERTAINING TO THE SOLUBILITY STUDIES CONDUCTED BY DR. CLIVE WILSON .......................16

A.    Introduction ........................................................................16

B.    Facts ...................................................................................16

    1.    The requested document has been produced. .............16

    2.    Alcon overstates the importance of this hand-drawn graph. ..................................................16

C.    Argument ............................................................................17

## TABLE OF CONTENTS (cont'd)

**Page**

           1.    Dr. Stella Should Be Permitted to Present His
                  Opinions that Are Based on Dr. Wilson's
                  Experimental Data. ....................................................................17

    D.    Conclusion ............................................................................18

V.    PLAINTIFF'S OPPOSITION TO ALCON'S MOTION *IN
LIMINE* TO  REQUIRE ALLERGAN TO BRING THE
INVENTORS ON THE  PATENTS-IN-SUIT TO TESTIFY
AT TRIAL ....................................................................................19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001)..............................................................................14

*Ekoteck Site PRP Committee v. Self*,
1 F. Supp. 2d 1282 (D. Utah 1998), citing,
*Daubert v. Merrell Dow Pharma.*, 509 U.S. 579 (1993)..........................................8

*Eli Lilly and Co. v. Massachusetts Institute of Technology*,
2004 WL. 1724632 (S.D. Ind. 2004) .......................................................................2

*Glaxo Welcome, Inc. v. Andrx Pharmaceuticals, Inc.*,
344 F.3d 1226 (Fed. Cir. 2003)..............................................................................13

*Gonzales v. National Board of Medical Exam'rs*,
225 F.3d 620 (6th Cir. 2000) ...................................................................................8

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed. Cir. 2004)..............................................................................14

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005)................................................................................2

*Minnesota Mining and Manufacturing Co. v. Johnson & Johnson Orthopedics*,
976 F.2d 1559 (Fed. Cir. 1992)................................................................................1

*In re Paoli Railroad Yard PCB Litigation*,
35 F.3d 717 (3rd Cir. 1994) .....................................................................................8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005), citing
*Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................13

*Pitney Bowes v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed.Cir.1999)................................................................................14

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000)..................................................................................2

*Schneider v. Fried*,
320 F.3d 396 (3rd Cir. 2003) ................................................................................7, 8

*Seaboard Lumber Co. v. United States*,
308 F.3d 1283 (Fed. Cir. 2002)................................................................................8

*Simmons Fastener Corp. v. Illinois Tool Works, Inc.*,
739 F.2d 1573 (Fed. Cir. 1984)................................................................................1

## AUTHORITIES (cont'd)

**Page(s)**

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
　407 F.3d 1371 (Fed. Cir. 2005)............................................................2

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
　721 F.2d 1540 ................................................................................1

*Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.*,
　21 F. Supp. 2d 366 (S.D. N.Y. 1998).........................................................2

## STATUTES

Fed. R. Civ. P. 37.............................................................................6, 7

Fed. R. Civ. P. 37(c)(1).......................................................................16

Fed. R. Evid 702 ..............................................................................7, 8

I.     **ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE OF ALLEGED SUPERIORITY OR COPYING**

A.     **Introduction**

Alcon seeks to prevent introduction of portions of Allergan's evidence of secondary considerations of non-obviousness. Such evidence is both legally relevant and factually compelling in this case. Alcon makes the internally inconsistent argument that they were "encouraged" to copy by the relevant statutory framework, but did not. In fact, by copying Allergan's product, Alcon has relied on the clinical proof of safety and efficacy that Allergan developed at its expense and now seeks to profit from the market that Allergan created for the product. Alphagan® P has even been commercially adopted over the less expensive generic versions of Alphagan®. Placed in the proper factual and legal context, there can be no question regarding the relevance and proper admissibility of this evidence.

B.     **Legal Standard**

Alcon seeks to preclude Allergan from introducing evidence which the Federal Circuit has stated "must be considered before a conclusion on obviousness is reached." Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopedics, 976 F.2d 1559, 1573 (Fed. Cir. 1992)(emphasis added)(reiterating that these factors are often "the most probative and cogent evidence in the record"). It is inappropriate to disregard any evidence relating to the secondary considerations, it must always be considered en route to a determination of obviousness. Simmons Fastener Corp. v. Illinois Tool Works, Inc., 739 F.2d 1573, 1575 (Fed. Cir. 1984) (trial court erred in excluding such evidence), see also, W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 1555 (Fed. Cir. 1983 ("All evidence bearing on the issue of obviousness . . . must be considered and evaluated *before* the required legal conclusion is reached.") The Federal Circuit's "precedents

1

clearly hold that secondary considerations, when present, must be considered in determining obviousness." Ruiz v. A.B. Chance Co., 234 F.3d 654, 667 (Fed. Cir. 2000).

Alcon argues that despite this mandate, this Court should ignore the law, and exclude compelling evidence of secondary considerations. The two cases which Alcon cites for this proposition are easily distinguishable from the facts of this case. In Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364, 1377 (Fed. Cir. 2005), the Federal Circuit found that commercial success was not an applicable factor because Merck faced no generic competition. As is discussed below, that is clearly not the case here. In Syntex (U.S.A.) LLC v. Apotex, Inc., 407 F.3d 1371, 1383 (Fed. Cir. 2005) the Federal Circuit found that commercial success was not an applicable factor because the active ingredient was patented. No such argument can be made regarding brimonidine.

Much more pertinent to the facts of the instant case is Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc., 21 F.Supp.2d 366, 374 (S.D. N.Y. 1998), where the court noted that the existence of cheaper generic competitors were "unusual factors that particularly negate[d]" the contention that the proffered commercial success evidence was not relevant. District courts have allowed pharmaceutical companies to establish the commercial success of their products by receiving evidence of sales and prescription data. See, e.g., Eli Lilly and Co. v. Massachusetts Institute of Technology, 2004 WL 1724632 at *35-36 (S.D. Ind. 2004). [Marsden Decl. Ex. 1.]

**C.    Argument**

  **1.    The Evidence of Commercial Success Is Compelling and Must Be Considered**

It is important to note at the outset that - contrary to what Alcon suggests - Alphagan® P has not become a commercial success in the absence of competition.

Alphagan® P must compete against several generic copies of the 0.2% brimonidine

tartrate formulation of Alphagan® - including one marketed by Alcon. Alcon's citation

to the FDA decision on the Citizen's Petition is stale – more than two and a half years

have passed since that letter, and Alphagan® P has faced generic competition during

most of that time. In fact, the first generic 0.2% brimonidine tartrate product was

approved only a week after the FDA circulated that response. Despite low-cost generic

substitutes, the market has selected Alphagan® P.

This success demonstrates that contrary to Alcon's suggestion that Alphagan® P

is not an improvement over Alphagan®, when faced with the choice between low-cost

generic 0.2% brimonidine tartrate and Alphagan® P, the market chooses Alphagan® P.

This is despite the initial skepticism as to whether Alphagan® P would provide a benefit

to the safety/efficacy profile of Alphagan®. Indeed, if the product were not a success,

generic manufacturers like Alcon likely would not be so keen to offer their own version

of the drug. [Marsden Decl. Ex. 2, ALC59130.

# REDACTED

] Such evidence is both relevant and highly probative of the non-

obviousness of the patents at issue.

### 2.    The Evidence of Copying Is Compelling and Must Be Considered

Alcon inconsistently argues that it was "encouraged" to produce a generic drug

product that is equivalent to Alphagan® P, but that it did not in-fact copy. They are

wrong on both counts: by selecting the regulatory route of a "paper NDA," (the product

of the "encouragement" one finds in Alcon's profit motive) they were not bound to a

3

strict ingredient-for-ingredient copy of Allergan's product and by choosing the same pH

as Alphagan® P and an SEC selected from Allergan's patent specification, they did copy.

Consider that

**REDACTED**

[Marsden Decl. Ex. 3,

ALC00174.] If Alcon did not intend to copy Allergan's product, then why carry-out such

reverse engineering? Consider, too, that sponsors of paper NDAs are not required to

repeat all the clinical testing otherwise necessary to gain approval of an NDA. Having

chosen to benefit from Allergan's extensive and expensive clinical data, Alcon cannot

now complain that it has not copied Alphagan® P.

        a.      **The purported "differences" go, if anything, to the**
                      **weight of the copying argument.**

Alcon cites three differences between Alphagan® P and Alcon's proposed

product to establish that it did not copy Alphagan® P – but none of those changes are

dispositive. Instead of choosing CMC, Alcon simply chose another known solubility

enhancing component Povidone, in an apparent, and failed, attempt to avoid Allergan's

patents. They chose a different preservative, partly, it would seem, in an effort to ensure

that their proposed brimonidine product was covered by Alcon's own patents. And they

also added mannitol, again in an effort to ensure that their product was covered by

Alcon's own patents.

**REDACTED**

        As a

"paper NDA" applicant, Alcon had the regulatory freedom to create a formulation which

differed from Allergan's in certain respects.

**REDACTED**

4

**REDACTED**   [Marsden Decl. Ex. 4, Deposition Transcript of Michael Pfleger at 43:23-44:3.]

**REDACTED**

**b.     Alcon knowingly chose to formulate in a certain way to take advantage of Alphagan® P.**

The evidence of copying is relevant here because it shows that, even presented with the opportunity to distinguish its product from Allergan, having decided to file a "paper NDA," Alcon chose instead to avail itself of Allergan's invention. Alcon could have chosen a different active ingredient and performed its own clinical trials. They did not. Alcon could have chosen a different concentration. They did not. Alcon could have chosen excipients that were not known solubility enhancing components. They did not. Instead they choose povidone, one of the SECs identified in Allergan's patent.

**REDACTED**

. Alcon could have been satisfied with profits from their generic 0.2% brimonidine tartrate product. They were not. If there were no advantage to Alphagan® P, there would be no reason to "invest" in a new product as Alcon has. They chose instead to copy the patented invention – presumably, then, in the face of their numerous alternatives, they did so because doing so meant they could enjoy the benefits of Allergan's innovation. The relevance is plain, and that is why Federal Circuit decisions have found this an important part of the analysis in discussing non-obviousness.

**D.     Conclusion**

For the reasons stated above, Plaintiff Allergan respectfully requests that Alcon's motion *in limine* be denied.

II.   **ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO PRECLUDE DR. WILSON FROM OFFERING OPINION TESTIMONY REGARDING THE STATISTICAL ANALYSIS OF HIS STUDENT'S SOLUBILITY MEASUREMENTS**

   **A.    Introduction**

   In three related Motions *In Limine*, Alcon seeks to exclude Allergan's evidence of infringement of the '337 patent.  In each motion, Alcon misapprehends the distinction between the weight and admissibility of evidence in the Court's consideration of expert witness testimony.  Even assuming, *arguendo*, that Alcon's premises are correct, their arguments go to the weight to be accorded to the evidence, and not to its exclusion – this is especially so as the case is a bench trial.  The "gatekeeper function" for such questions of relevance are here best accomplished at trial.  For the reasons shown below, however, Alcon's motions are legally and factually incorrect.  Allergan's evidence should be admitted under the relevant standards and should not be excluded under Fed. R. Civ. P. 37.

   **B.    Facts**

   Prior to the initiation of litigation,

**REDACTED**

Those tests were performed using ANOVA, the exact statistical method used by Allergan's expert, yet criticized by Alcon.  [Marsden Decl. Ex. 5, Espino 18.]

   To investigate whether the povidone of Alcon's proposed brimonidine product enhances the solubility of brimonidine tartrate, Allergan engaged Dr. Clive Wilson, a Professor and the J.P. Todd Chair of Pharmaceutics at the Strathclyde Institute for BioMedical Sciences, University of Strathclyde, in Glasgow, U.K.  To eliminate the potential for any bias, prior to performing any experiments, Dr. Wilson determined the best statistical methodology by which to analyze the data.  [Marsden Decl. Ex. 6,

Deposition Transcript of Dr. Clive Wilson, page 194:5-12.] After consideration of different approaches, Dr. Wilson ultimately chose two way analysis of variance ("ANOVA"). [*Id.* at 195:4 – 197:5] Only after the proper statistical method was chosen did Dr. Wilson and his student, Hardick Shah, begin to perform and analyze the results of their experiments – results that inescapably show that povidone enhances the solubility of brimonidine tartrate.

In conducting his analysis, Dr. Wilson and his student, Hardick Shaw, prepared six studies. Each study examined the effect that povidone had on the solubility of brimonidine tartrate at pH's 7.0, 7.2, 7.4, and 7.6. And each study showed, for the relevant pH ranges, that povidone increased the solubility of brimonidine tartrate. While some of the early studies experienced pH drift, meaning that the solution became more acidic over time ultimately drifting out of the applicable range, all of the studies show that for the pH range of interest, povidone increased the solubility of brimonidine.

Ironically, it is these earlier studies and Dr. Wilson's use of ANOVA that Alcon focuses on in an attempt to argue that the povidone Allergan used actually decreased the solubility of brimonidine, povidone that Alcon intimates is in some way inferior or different than theirs. What Alcon is hoping goes unnoticed or perhaps unchallenged in its brief is the following: (1) that internally it used ANOVA to determine whether it infringed the '337 patent; (2) that the data points that it relies on to skew the data in its favor had shifted so far downward as to no longer be relevant; (3) that the povidone that Dr. Wilson used was chemically identical to that used by Alcon; and (4) Dr. Stella performed his own analysis of Dr. Wilson's data and results, as well as Alcon's internal data and results, and drew his own conclusion – povidone increases the solubility of brimonidine tartrate.

C.    **Legal Standard**

The Third Circuit has explained that Federal Rule of Evidence 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider v.

Fried, 320 F.3d 396, 404 (3rd Cir. 2003) (citations omitted). Qualification relates to the expert's specialized expertise. Id. Reliability relates to the methods and procedures upon which the expert bases his opinion. Id. Finally, "fit" requires that the expert testimony be relevant to the issues of the issues of the case and must assist the trier of fact. Id.

Properly articulated, Alcon's challenge to Dr. Wilson's testimony is based on the second of the Fed. R. Evid 702 factors, that of reliability. Dr. Wilson is not being offered as an expert in statistics as Alcon suggests – he is being offered as an expert in the field of pharmaceutical formulations, one in which he is unquestionably qualified. The type of dispute that Alcon raises – to the "deficiencies in the experiments" and the "appropriate statistical method" – are classic challenges to the methodology and procedure employed by the expert. As such, these challenges are based on the fact-dependent reliability prong. See, e.g., In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 742 (3rd Cir. 1994) (listing eight factors that a court should consider when considering the reliability of expert testimony, including, e.g., whether the hypothesis is testable, known or potential rates of error and general acceptance of the methodology). Given the highly factual nature of this inquiry, and that this Court will act as the trier of fact in a bench trial, the importance of the "gatekeeping" function for the Court is lessened. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002). This reflects the "substantial flexibility in admitting proffered expert testimony at the front end" that courts have when conducting bench trials. Gonzales v. National Bd. of Med. Exam'rs, 225 F.3d 620, 635 (6th Cir. 2000). Indeed, all of Alcon's argument goes to the proper weight of the evidence, for which the "better approach under Daubert in a bench trial is to permit the expert testimony and 'allow vigorous cross-examination, presentation of contrary evidence' and careful weighing of the burden of proof." See Ekoteck Site PRP Committee v. Self, 1 F.Supp.2d 1282, 1296 n.5 (D. Utah 1998), citing, Daubert v. Merrell Dow Pharma., 509 U.S. 579, 596 (1993).

D.    **Argument**

1.    **Dr. Wilson should not be precluded from offering testimony regarding ANOVA, the very method internally chosen by Alcon, or its use in this case.**

As discussed above, after careful consideration of statistical methods that might be applied, Dr. Wilson chose ANOVA, just as Alcon's internal statistician had. Once the tests were complete and the data had been collected, Dr. Wilson and Mr. Shah used commercially available and widely used computer software to perform this analysis. The results of their tests were then attached to Dr. Wilson's expert report submitted in this case.

Alcon hopes that by arguing that because Dr. Wilson is admittedly not an expert in statistics, he should be precluded from testifying regarding the appropriateness of ANOVA. Alcon misses the point. Dr. Wilson is not being offered as an expert in statistics or biostatistics. Dr. Wilson is being offered as an expert in pharmaceutical formulations – an area of expertise that Alcon has not challenged. As an expert in pharmaceutical formulations, Dr. Wilson frequently uses statistics to evaluate his results and during his over 30 years of experience has developed an understanding as to what methods are appropriate in any given situation. It is in this fashion that Dr. Wilson will be offering testimony regarding ANOVA, not as an expert in statistics, but rather as an expert of pharmaceutical formulations who has been using statistics for over 30 years to analyze his results. And based on that experience, over 400 publications, and 140 peer-reviewed articles, Dr. Wilson chose ANOVA.

2.    **The '337 patents use of "regression analysis" is completely irrelevant as that is to an entirely different issue.**

First and foremost, the claims of the '337 patent do not require that any statistical analysis be done at all, much less some specific statistical analysis. The claims only require the use of a solubility enhancing component – something all of the tests that have been performed in this case conclusively show. Despite Alcon's musings and intimations

9

to the contrary, the analysis used in the '337 patent has absolutely nothing to do with determining whether experimental results of a formulation with PVP versus experimental results of a formulation without PVP are statistically significant. It only had to do with fitting a line.

The '337 patent used a "nonlinear least squares routine" to determine "the goodness of fit" between experimental data and theoretically calculated data. Essentially how well the line that resulted from plotting experimental data fit with a line that resulted from plotting the results of a theoretical calculation. But that is not the analysis that is being performed here. Here, two sets of experimental results are being compared, a formulation with PVP to a formulation without PVP. There is no theoretical line to be fit, rather the experimental data from two different formulations at various pHs must be compared.

### 3.    Allergan has produced all of the requested materials.

With the exception of a publicly available textbook, Allergan has produced all of the materials requested by Alcon. Therefore, Alcon's motion should not be granted on that basis.

### E.    Conclusion

For the foregoing reasons, Alcon's motion *in limine* to prevent Dr. Wilson from offering opinion testimony about the validity, reliability, or appropriateness of the statistical analysis of the solubility measurements made by Dr. Wilson and Hardick Shah should be denied.

III.   **ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO EXCLUDE OPINIONS OF DR. VALENTINO STELLA PERTAINING TO THE ALLEGED INFRINGEMENT OF CLAIM 6 OF THE '337 PATENT**

A.   **Introduction**

In the second of three related Motions *In Limine*, Alcon seeks to exclude Allergan's evidence of Alcon's infringement of the '337 patent. While Alcon never explicitly articulates the basis for its motion, it appears to be based on Alcon first taking it upon itself to construe the term "biological environment" and then arguing that because Dr. Stella's analysis doesn't take into consideration this construction it should be excluded. Alcon's argument is both legally and factually wrong.

B.   **Argument**

1.   **Alcon's argument improperly imports limitations into the claim.**

Alcon argues that the term "biological environment" as used in claim 6 "comprises numerous elements that could affect an ophthalmic composition, including tear dynamics such as drainage rates; tear components such as mucins, lipids, proteins and acid- and base-neutralizing buffers; and physical properties such as tonicity, or osmotic pressure, as well as pH." Alcon's brief at p. 15. These limitations cannot be found anywhere in the specification and are not even supported by Alcon's own experts. Rather, the specification and the experts all support Dr. Stella's focus, i.e., "the pH range of interest" of 7.0 and higher.

As discussed below, the specification acts as the proper reference to use in interpreting the claim language. The specification, in discussing the background of the invention, discusses the relevant "neutral to alkaline biological environments," '337 patent, col. 1:41-42, and goes on to teach that "the biological environments into which the present compositions are introduced have pHs ranging from about 7 to about 9." Id.

at col. 4:45-47. The importance of this is made clear later in the specification, where it is taught that "unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers." Id. at col. 6:14-16.

### 2.    Dr. Stella's interpretation is reasonable and comports with the intrinsic evidence.

Here, Dr. Stella's focus on pH in showing infringement of claim 6 is the product of what one of ordinary skill in the art would understand claim 6 to encompass. Dr. Stella represents that pH 7.1 to 7.3 and higher is relevant to his analysis because, as his expert report establishes, "when one refers to physiological pH, the pH of most fluids in the body, an often quoted value is 7.4 or a slightly basic pH. The pH of tear fluid in the eye is also said to be around 7.4." [Marsden Decl. Ex. 7, Expert Report of Dr. Valentino Stella, page 6.] And consistent with Alcon's expert Dr. Amidon, Dr. Stella notes that the pH of the solution is particularly important for drugs that are either acids or bases. [Id. at page 7.] This is precisely why Dr. Stella referred to the analyzed pH range as the "pH range of interest."

### 3.    The experts and specification all agree on the importance of pH.

For the purposes of the instant case, the most relevant characteristic of the biological environment of the eye is, in fact, the pH. Recall that the invention here relates to the ability to administer a lower concentration of adrenergic agonist because Allergan's novel formulation allows the drug to cross the epithelial layer of the eye more effectively; as mentioned throughout the specification and the expert reports, the ionization state of the drug (and therefore the pH) is critical to an understanding of this issue. Given the influence of pH, it is reasonable for Dr. Stella to have focused on pH in

12

discussing the behavior of Alcon's product. Such an approach is entirely consistent with the intrinsic evidence from the specification of the patent and consistent with the views of all experts in the case.

### C.    Legal Standard

#### 1.    The specification is the best guide to claim construction.

As the Federal Circuit recently stated in an *en banc* opinion limiting the dictionary-based claim construction methodology endorsed by <u>Texas Digital</u>, "the specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1315 (Fed. Cir. 2005), <u>citing</u> <u>Vitronics Corp. v. Conceptronics, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

#### 2.    It is proper for the court to consider expert testimony on claim construction and infringement.

Since patents are addressed to those of ordinary skill in the art, and since the meaning of a claim must be understood from the perspective of one of ordinary skill in the art, the proper objective baseline for beginning claim construction is, not surprisingly, one of ordinary skill in the art. <u>See</u> <u>Phillips</u> at 1313. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning *to the ordinary artisan* after reading the entire patent." <u>Id.</u> at 1321(emphasis added). The Federal Circuit has countenanced reliance on expert testimony in claim construction as such evidence that may aid the court in determining what a person of ordinary skill in the art would understand a claim term to mean. <u>Id.</u> at 1317, <u>citing</u> <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 980 (Fed. Cir. 1995)(*en banc*). <u>See also</u>, <u>Glaxo Welcome, Inc. v. Andrx Pharmaceuticals, Inc.</u> 344 F.3d 1226, 1229 (Fed. Cir. 2003) (If relevant and helpful, the court may receive the

testimony of experts in the field of the invention in determining the scope and meaning of the patent claims.);  Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1359 (Fed. Cir. 2004) (when expert evidence has been offered with respect to the issue of claim construction, it must comport with the intrinsic evidence in the case); Pitney Bowes v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed.Cir.1999) (expert evidence may assist the trial judge in understanding the invention as viewed by persons in the technologic field).

As recounted by the Federal Circuit with respect to expert testimony of infringement:

> Daubert, as elaborated … requires that the court assure that the scientific or technologic evidence be relevant and of appropriate scientific validity, according to the standards of the discipline. When competing views of qualified experts satisfy these criteria, the trier of fact may consider them in reaching its decision. Indeed, it would contravene fundamental principles of due and fair process to withhold evidence of disparate scientific opinion relevant to the findings--in this case of infringement vel non--required of the jury.

Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1349 (Fed. Cir. 2001)(citations omitted).

As is clear from the foregoing, courts regularly receive expert testimony on claim construction and infringement.  Alcon's motion, if anything, merely goes to the weight to be accorded to Dr. Stella's testimony, especially where, as here, his credentials have not been challenged.

### D.    Conclusion

Alcon suggests that this Court would be confused by certain portions of Allergan's evidence of infringement.  Far from it: Dr. Stella's evidence would help the

Court to understand the issues and would provide a proper context for claim construction and infringement analysis.  Allergan respectfully requests that Alcon's motion be denied.

IV.    **ALLERGAN'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO EXCLUDE OPINIONS OF DR. STELLA PERTAINING TO THE SOLUBILITY STUDIES CONDUCTED BY DR. CLIVE WILSON**

A.    **Introduction**

In the third of Alcon's attempts to exclude portions of Allergan's infringement case, Alcon overstates the importance of a hand-drawn graph created by Dr. Stella and seeks as a result of the timing of its production to exclude a broad range of testimony. As an initial matter, the Court should recognize that the requested information *has been produced* to Alcon. Therefore no exclusion pursuant to Fed. R. Civ. P. 37(c)(1) is appropriate. As they are now in possession of the requested information they will be able to cross-examine Dr. Stella on its contents at trial, should they feel the need.

B.    **Facts**

1.    **The requested document has been produced.**

Allergan produced Dr. Stella's graph as AGN0225237 to Alcon on January 10, 2006.[1]

2.    **Alcon overstates the importance of this hand-drawn graph.**

In both his expert report and his deposition testimony, Dr. Stella indicated that he relied, *in part*, on the experimental solubility data of Dr. Clive Wilson in formulating his opinion that Alcon's proposed brimonidine product infringes the claims of the '337 patent. In his report, Dr. Stella explained that "[t]he results of [Dr. Wilson's] testing indicate that, at final pH values within the pH range of interest, approximately 7.1-7.3 and higher, the solubility of brimonidine was increased in the samples containing povidone relative to its solubility in the similar samples containing no povidone." [Marsden Decl., Ex. 7, Stella Expert Report at p. 12.] He also indicated that Dr. Wilson's statistical analysis of the data demonstrated that povidone increased the solubility of

---

[1]    Allergan indicated to Alcon that Dr. Stella was unable to locate the original graph, leading, in part, to the delay in production, but that the graph that was produced was an accurate reproduction prepared by Dr. Stella.

brimonidine in the samples. These opinions were based on Dr. Wilson's data tables and statistical analysis and not on any graph created by Dr. Stella.

At Dr. Stella's deposition, he also testified that he had reviewed the solubility data generated by Dr. Wilson and found that it supported the conclusion that povidone increased the solubility of brimonidine in Alcon's proposed product. Dr. Stella indicated that, in addition to reviewing the data tables and statistical analysis prepared by Dr. Wilson, he had later drawn a graph of some of the numbers in those tables. Dr. Stella prepared the graph after he submitted his expert report:

> Q. (By Mr. Thomasch) When did you do this plotting and visual inspection?
> A. I did that in the last two weeks.
> Q. So that would be subsequent to both your initial report and your rebuttal report?
> A. Yes.

[Marsden Decl., Ex. 8, Stella Depo. Tr. at 52:18-23.]

Dr. Stella indicated precisely which numbers he had used in his graph, explaining as follows:

> Initially, I just plotted [tables] 5 and 6, and then I put the data—the two high pH's from Tables 1 and 2.

Id. at 54:2-4.] Dr. Stella also indicated that he did not do any separate statistical analysis on the graph he prepared. Id. at 52:17-19.] It was merely the exact numbers from Dr. Wilson's tables presented in a different format.

**C.    Argument**

    **1.    Dr. Stella Should Be Permitted to Present His Opinions that Are Based on Dr. Wilson's Experimental Data.**

Alcon has presented no reason why Dr. Stella should be precluded from presenting his opinions based on Dr. Wilson's experimental data, other than non-production (properly, delayed production, if anything) of a single graph. First, Dr. Stella's export report presents opinions on Dr. Wilson's data independent of Dr. Stella's

graph. In its motion, Alcon makes it appear as if Dr. Stella's hand-drawn graph was the only basis for his opinions on Dr. Wilson's data. This is not the case. In Dr. Stella's expert report, he presented opinions about Dr. Wilson's data that were not based on this graph. In fact, Dr. Stella did not even prepare the graph until well after both of his expert reports were filed.

Additionally, the graph does not provide any information that the data itself, combined with Dr. Stella's testimony, does not already provide. Dr. Stella testified at his deposition as to exactly what numbers he had graphed and explained that he did no additional analysis. If Alcon was so concerned about a visual rather than a numerical presentation of the data, it could have simply graphed the numbers itself.

Since a reproduction of the graph has now been produced and since the graph was not the basis for the opinions Dr. Stella rendered in his report, Dr. Stella should be allowed to testify as to those opinions.

**D.    Conclusion**

For the foregoing reasons, Allergan requests that the Court deny Alcon's motion to exclude Dr. Stella's opinions pertaining to the experimental data of Dr. Wilson.

V.    **PLAINTIFF'S OPPOSITION TO ALCON'S MOTION *IN LIMINE* TO REQUIRE ALLERGAN TO BRING THE INVENTORS ON THE PATENTS-IN-SUIT TO TESTIFY AT TRIAL**

Allergan opposes this motion only to the extent that it disagrees with Alcon's recitation of the law regarding the production of witnesses at trial and representation of the particular facts of this case. Allergan reserves the right to challenge Alcon's legal and factual assertions contained in its motion.

As indicated on Allergan's Preliminary List of Fact Witnesses, filed with the Joint Pre-Trial Order, Allergan intends to have both Dr. Orest Olejnik and Dr. Edward Kerslake testify at trial, absent unforeseen circumstances. Therefore, no order requiring their appearance is required.

Allergan respectfully requests that this Court deny Alcon's motion as moot.

Dated:  January 17, 2006          FISH & RICHARDSON P.C.

By:  */s/ William J. Marsden, Jr.*
          William J. Marsden, Jr. (marsden@fr.com)
          Sean P. Hayes (hayes@fr.com)
          919 N. Market Street, Suite 1100
          P.O. Box 1114
          Wilmington, DE 19899-1114
          Telephone:  (302) 652-5070

          Jonathan E. Singer
          Michael J. Kane
          Deanna J. Reichel
          3300 Dain Rauscher Plaza
          60 South Sixth Street
          Minneapolis, MN  55402
          Telephone:  (612) 335-5070

          Juanita Brooks
          W. Chad Shear
          12390 El Camino Real
          San Diego, CA 92130
          Telephone: (858) 678-5070
Attorneys for Plaintiffs
ALLERGAN, INC. and ALLERGAN SALES, LLC

10588870 (2) (2).doc

20

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2006, I electronically filed with the Clerk of Court Plaintiffs Allergan, Inc. and Allergan Sales, LLC's Oppositions to Alcon's Motion in Limine 1-5 using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel.

Josy W. Ingersoll
John W. Shaw
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE  19899-0391

I hereby certify that on January 24, 2006, I have sent via electronic mail, the document(s) to the following non-registered participants:

Veronica Mullally
Daniel J. Thomasch
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103-0001

_/s/ William J. Marsden, Jr._
William J. Marsden, Jr. (#2247)

80029339.doc